## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| JANE DOE 1,<br>JANE DOE 2,<br>JANE DOE 3,<br>JANE DOE 4,<br>JANE DOE 5,<br>JANE DOE 6,<br><br>　　Plaintiffs,<br><br>　　v.<br><br>HOWARD UNIVERSITY,<br><br>　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:17-cv-00870-TSC<br><br>**JURY TRIAL DEMAND** |

---

### FIRST AMENDED COMPLAINT

(Discrimination and retaliation in violation of Title IX of the Education Amendments of 1972)

**COMES NOW** Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6, through their attorneys, in the above-captioned action state to this Honorable Court their First Amended Complaint as follows:

### PRELIMINARY STATEMENT

1.　　The Six Jane Does are Howard University students or former students who, in 2014, 2015, and 2016, reported sexual assaults perpetrated by male students and employees of Howard University.  The University's actions have exacerbated and extended, rather than corrected, the resulting interference with the educational opportunities of each woman.

2.　　Howard is deliberately indifferent to students' Title IX rights, where students wait indefinitely for resolution or notification regarding their Title IX complaints, where Howard fails to follow its own policy of investigation within 60 days and fails to notify complainants of the

need for more time, and while complaints are pending, students operate without support, remedial measures, or academic accommodations to lessen an experience of an active hostile educational environment. Howard's response to reports of sexual assault amounts to an official policy of sex discrimination.

3.      In February 2016, Plaintiff Jane Doe 1 was raped by a male Howard student who was a Resident Assistant ("RA") in her dormitory.  Six weeks after reporting the rape to Howard and receiving no response or support from Howard despite numerous attempts, Plaintiff Doe 1 started a Twitter storm criticizing Howard's mishandling of her complaint of sexual assault.  When other students came forward to disclose their similar experiences of indifference at the hands of Howard, Doe 1 learned that Plaintiff Jane Doe 2 reported to Howard in October 2015 that she was also raped by the same male Howard student.  Plaintiff Doe 2 left Howard when her case was not investigated because she felt unsafe on campus and was receiving no information or support from Howard.  Howard's failure to investigate and effectively resolve Doe 2's complaint meant the assailant remained on campus as an RA and raped Doe 1 over five months later.  Only after public criticism brought attention to Howard's deliberate indifference in April 2016 did Howard's Title IX Coordinator reach out to Doe 2 to conduct an investigation into her October 2015 report.  Then, in response to Doe 1's Twitter activity, Howard's Dean of Student Affairs told her, "You embarrassed your family by doing that."  Doe 1's sexual assault investigation still has not been resolved.

4.      In November 2014, Plaintiff Jane Doe 3 reported to Howard that she had experienced sexual and other physical abuse at the hands of a Howard campus police officer.  She told Howard that she was interested in arranging counseling services and by January 2015, expressed a greater sense of urgency for such counseling because she was having an extremely

hard time coping with the rape, was extremely depressed, and was suicidal.  Two weeks passed without help from Howard.  Doe 3's ROTC advisor tried to assist Doe 3 and the physician she enlisted to help Doe 3 was told by Howard that Doe 3 would have to wait an additional week for her case to be considered.  Doe 3 did not receive counseling and by March 2015, after her emotional health had worsened further, she was fired from her job and her performance in her classes deteriorated.  When Doe 3 requested the record of her report from the Howard counseling center in August 2016, a Howard employee there told her she should be careful with her records because people will "judge her" for her file, implying she should be embarrassed by her sexual assault or subsequent requests for medical treatment which she never received.

5.      In March 2016, Plaintiff Jane Doe 4 reported to Howard that a male Howard student raped her in a campus dorm.  She asked about counseling services and the possibility of changing her assigned dorm because she did not feel safe.  Several days passed before Doe 4 had a response from Howard.   During the week after the rape and the move, Doe 4 asked for academic accommodations to extend deadlines in three of her classes.  Howard gave her a form letter to provide to professors when requesting the extensions and told her that the school could not "push" professors who were unwilling to accommodate her needs.  Doe 4 continued to see her assailant on campus and reported to Howard that he appeared to be not abiding the stay away order issued by Howard.  Howard informed her that the stay away order only prohibited him from approaching her directly and did not require the accused assailant to leave the area or change his direction because she was physically present; that she would instead need to alter her course to feel safe on campus.  In early August 2016, Doe 4 learned that the assailant had been assigned to her dorm again for the start of the new academic year.  Three weeks passed while Doe 4 struggled with anxiety that her assailant would live in her dorm again and Howard failed to respond to requests

to confirm that the obviously wrong decision would be corrected.  On August 17, 2016, Howard reported to Doe 4 that her assailant was living on campus but was assigned to different housing. On August 23, 2016, 165 days after her report, Doe 4 received a letter dated August 17 indicating that her assailant had been suspended from campus for one semester due to a "finding of sexual violence in violation of the Title IX policy."  Less than two months later, Doe 4 saw her assailant on campus at a Howard homecoming pep rally.  She immediately reported it to campus police who were present.  Campus police only removed him from campus after Doe 4 could prove that he was not supposed to be there, admitting that "the Title IX Office does not share its findings with campus police."

6.       In April 2015, Plaintiff Jane Doe 5 reported to Howard that she was sexually assaulted by a male Howard student. Shortly after reporting the assault, Doe 5 received a letter stating that she was no longer able to graduate that semester, as planned.  With this news, Doe 5 sought academic accommodations to take her remaining class credits at a community college in her hometown over the summer because she did not feel safe on Howard's campus.  Plaintiff Doe 5 was passed around from administrator to administrator and was not able to get assistance or a response from Howard until an outside advocate intervened.  After completing these summer courses, it again took several months for Plaintiff to obtain confirmation or even an acknowledgement that Howard accepted the credits and that she was able to graduate.  Meanwhile, Plaintiff's investigation took Howard 228 days (7½ months) to complete, more than three times the amount of time mandated by Howard policy.  In October 2016, Doe 5's assailant was accused and criminally convicted of sexually assaulting another woman in the District of Columbia.

7.       In April 2016, Plaintiff Jane Doe 6 reported to Howard that she was sexually assaulted by a male Howard student, Assailant 5. When she reported her rape, Doe 6 provided

4

witness information and supporting documents. Over the course of the next four months, Smiley twice asked Doe 6 to send her copies of the same documents and did not call the witnesses. In August 2016, Doe 6's academic advisor spoke with Dean Heath, who told her that Doe 6's assailant already had sexual assault complaints against him and therefore should not be on campus much longer. As of March 2017, eight months later, Doe 6 still saw her rapist on campus weekly. In April 2017, Dean Heath told Doe 6 that her rapist assaulted another student and Howard was "reopening" her case. Doe 6 did not receive information about the status of the investigation into her complaint as it progressed, let alone information suggesting that her case was closed. Although Smiley told Doe 6 she would complete the investigation within three months, more than 500 days have passed since Doe 6's report without resolution. In June 2017, Doe 6 learned that Howard knew months earlier that her assailant had several cases of sexual violence against him and yet he still remained on campus, which provided him the opportunity to assault her and another student. Doe 6 continues to see Assailant 5 on campus.

8.      Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. ("Title IX"), the federal civil rights law that prohibits discrimination on the basis of sex in education, holds colleges and universities responsible when they are deliberately indifferent to known acts of sexual assault and a sexually hostile educational environment.

9.      Howard University violated Title IX when it (1) failed to timely investigate known complaints of sexual assault on campus; (2) failed to provide academic accommodations to complainants, where targets of rape failed courses, were not permitted to make up work missed, had to contend with professors who refused to provide reasonable accommodations, and experienced hostility and delay from Howard administrators when they requested assistance; (3) failed to provide access to counseling services for victims of sexual violence; (4) demeaned and

treated hostilely victims of rape; (5) failed to provide a safe educational environment for students who complained of sexual assault or harassment; and (6) failed to protect against or prohibit retaliation when students asserted their rights under Title IX.

10.     Howard University violated Title IX when it failed to follow its policy of completing a Title IX investigation into complaints of sexual violence within 60 days, where without explanation, Plaintiffs' complaints were not resolved in less than 100 days, and more than 200 days later, some remain incomplete without notification from Howard of the reason for the delay.

11.     Howard's deliberate indifference to student rights under Title IX, where its failed investigation procedure allows accused assailants to remain on campus for an extended period of time without redress while also leaving students without support or accommodations, created a hostile environment that deprived Plaintiffs of equal access to an education..

12.     Howard University's policy, procedures, and treatment of those who report sexual harassment and assault have a systemic effect of denying complainants an equal access to educational programs or activities, in violation of Title IX.

13.     Howard University's discriminatory and retaliatory response to multiple complaints of sexual assault and harassment created an educational environment that substantially increased Plaintiffs' and other Howard students' chances of being sexually assaulted.  Howard's failure to promptly and appropriately investigate and respond to these assaults furthered sexual harassment and a hostile environment, denying Plaintiffs and other female students, access to educational opportunities.

## PARTIES

14.     Plaintiff Jane Doe 1 was and is an adult female student at Howard University since August 2015, residing in the District of Columbia during the academic year since January 2016.

15.     Plaintiff Jane Doe 2 was an adult female student at Howard University from August 2014 to December 2015 and now resides in Alabama.

16.     Plaintiff Jane Doe 3 was and is an adult female student at Howard University since August 2013, residing in the District of Columbia until May 2015, now residing in Maryland.

17.     Plaintiff Jane Doe 4 was and is an adult female student at Howard University since August 2015, residing in the District of Columbia during the academic year.

18.     Plaintiff Jane Doe 5 was an adult female student at Howard University from August 2012 to May 2016 and now resides in Georgia.

19.     Plaintiff Jane Doe 6 was and is an adult female student at Howard University since August 2015, residing in Maryland.

20.     Defendant Howard University is an institution of higher education located in the District of Columbia.  At all times relevant hereto, Howard University was and is a recipient of federal financial assistance within the meaning of 20 U.S.C. § 1681(a).

## JURISDICTION AND VENUE

21.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

22.     Venue lies in this Court pursuant to 28 U.S.C § 1391, as all of the acts alleged herein occurred in the District of Columbia.

## FACTS GIVING RISE TO RELIEF

23.     Candi N. Smiley ("Smiley") is Howard University's Title IX Coordinator.  At all times relevant hereto, Ms. Smiley oversaw Howard's Title IX compliance, including the

investigation and response to all allegations of sexual harassment, sexual assault, and other sex-based discrimination.

24.     Dean Elaine Bourne-Heath ("Dean Heath") is the Dean of Howard University's Office for Special Student Services, the office that coordinates students' need for accommodations because of disabilities, medical conditions, or reports under Title IX.

25.     The Network for Victim Recovery of DC ("NVRDC") is a non-profit organization operating in the District of Columbia that assists victims of all crimes with advocacy, case management, and legal services.  Advocates at NVRDC represented Plaintiffs in their pursuit for Howard's compliance with Title IX.

26.     Howard University's *Title IX (Student) Policy on Prohibited Sexual Harassment and Gender-Based Discrimination in Education Program and Activities*, ("Title IX Policy") Policy Number 400-005 Governance, Risk and Compliance, establishes Howard's purpose and procedures related to compliance with Title IX and campus safety.  .

27.     Howard's Title IX Policy states that "Howard University (the 'University') is committed to ensuring compliance with *Title IX of the Education Amendments of 1972*, as amended, and the *Violence Against Women Act*. To that end, the University reaffirms its commitment to providing students with educational opportunities free from sexual harassment and discrimination based upon gender, gender expression, gender identity, sexual orientation, or marital status."

28.     Howard's Title IX Policy acknowledges that "[s]exual harassment (hereinafter referred to as 'harassment') and gender-based discrimination (hereinafter referred to as 'discrimination') are violations of both federal and local law" and "allows the University to

reaffirm its commitment to providing educational opportunities free from the negative effects of sexual harassment and discrimination."

29.     It further states that "[t]he University considers harassment and discrimination to be extremely serious matters. In accordance with federal law, the University has a legal obligation to investigate all allegations of harassment and discrimination. This obligation arises when the University knows with certainty or has reason to believe that sexual harassment or discrimination may have taken place. Upon learning of any such allegations, the University must use its best efforts to investigate all matters brought to the attention of a Title IX Officer or a Responsible Employee. Therefore, upon learning of potential prohibited activity, the University may take action to investigate an allegation even if the alleged victim does not file a formal written complaint."

30.     "Title IX Officers are primarily responsible for implementing [Howard's Title IX] policy and ensuring that all students and Responsible Employees are adequately trained or otherwise made aware of their rights and responsibilities under this policy."

31.     When complaints are made, Howard's Title IX Policy governs how they are processed.  "The Title IX Officer will have 60 calendar days to conduct an impartial, thorough and timely investigation of all complaints alleging harassment or discrimination under this policy. In the event additional time is needed, the Title IX Officer will notify the Complainant and the Respondent, in writing, that additional time is needed for completion of the investigation."  The findings of an investigation are compiled into a "Report of Investigation" and the "[r]eport must be completed within the 60-calendar day investigation period, unless prior notice was given to both Parties that additional time was required to complete the investigation."

32.     Howard's prolonged failure to adhere to its Title IX Policy inflicted a deep sense of betrayal on Plaintiffs that pervaded their educational experience after they reported sexual

assaults and deprived them of access to the educational opportunities or benefits provided by the school.

33.     Plaintiff Jane Doe 1 did not receive resolution of her complaint within 60 days, nor did she receive notification that the investigation required additional time.  The investigation is incomplete after more than 450 days (15 months) and she was never notified that her assailant was removed from campus.

34.     Plaintiff Jane Doe 2 did not receive resolution of her complaint within 60 days, nor did she receive notification that the investigation required additional time.  The investigation lasted over 170 days (5 ½ months).

35.     Plaintiff Jane Doe 3 did not receive resolution of her complaint within 60 days, nor did she receive notification that the investigation required additional time.  The investigation is incomplete after 28 months.

36.     Plaintiff Jane Doe 4 did not receive resolution of her complaint within 60 days, nor did she receive notification that the investigation required additional time.  The investigation lasted more than 165 days (5 ½ months).

37.     Plaintiff Jane Doe 5 did not receive resolution of her complaint within 60 days, nor did she receive notification that the investigation required additional time.  The investigation lasted 228 days (7 ½ months), more than three times the time mandated by Howard policy.

38.     Plaintiff Jane Doe 6 did not receive resolution of her complaint within 60 days, nor did she receive notification that the investigation required additional time.  The investigation is incomplete after 19 months.

39.     Howard's Title IX Policy provides information for law enforcement assistance and reporting, but maintains its own procedure separate and distinct from any criminal process.

40.     The purpose of the school's investigation is to ensure a complainant's safety on campus and adjudicate whether the assailant should continue to be part of the educational community.

41.     Howard's Title IX Policy establishes remedial measures for complainants. "Promptly upon learning of potential harassment or discrimination, the Title IX Officer will consult with the Complainant to determine whether interim remedial measures should be taken to alleviate problems or conflicts that currently exist or that may arise while the investigation is pending. Such measures may involve either the Complainant or the Respondent and may include, but are not limited to, academic & residential accommodation, as well as no-contact orders for students; work reassignments for faculty or staff members, administrative leave, or excusable absences from class and/or work assignments as well as no-contact orders."

42.     Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6 did not receive prompt consultation to determine the remedial measures or accommodation they needed to continue their education absent a hostile educational environment.  Plaintiffs experienced hostility and delay at the hands of Howard administrators.

43.     Howard's process places a significant burden on the complainant and is riddled with ineffectiveness, making it virtually impossible for students to navigate.

44.     Each Plaintiff continued her education at Howard without resolution of her sexual assault complaint, without remedial measures or academic accommodations, and without prompt or even reasonable response from the Howard administrators tasked with Title IX compliance.

45.     Howard's response to student complaints of sexual assault and requests for accommodations allowed continued harassment that pervaded the students' educational

experience and deprived them of access to the educational opportunities or benefits provided by Howard.

46.     Howard's response to known acts of sexual assault amounted to an official policy of sex discrimination.

47.     Howard's Title IX Policy bans retaliation.  "[The] submission of a complaint alleging harassment or discrimination is considered to be a protected activity. As such, retaliation against a Complainant, Dean, Title IX Officer, administrator, faculty member, witness or individual involved in any aspect of the investigative process under this policy is strictly prohibited and will be sanctioned accordingly."

### *Plaintiff Jane Doe 1*

48.     Plaintiff Jane Doe 1 began as a student at Howard University in August 2015, earning a full academic scholarship.

49.     In January 2016, Howard University hired Plaintiff Doe 1 as a Resident Assistant ("RA"). Resident Assistants live on Howard's campus and are charged with assisting students on their assigned floor, wing, or residential community with any personal or academic concerns that arise.  Resident Assistants serve "as a facilitator and role model to fellow college students to encourage a cooperative and considerate group living environment."

50.     Once hired as an RA, Plaintiff Doe 1 was assigned to live and work in the College Hall South dormitory for the Spring 2016 semester.

51.     On February 7, 2016, Plaintiff Doe 1 was raped in her dormitory in College Hall South by Howard student Assailant 1.  He was also an RA in College Hall South.

52.     The next day, Plaintiff Doe 1 told her friend about the assault, but was afraid to tell anyone else. She was emotionally shocked and physically in pain.

53.     On February 28, 2016, Plaintiff Doe 1 reported the rape to Howard's Title IX Coordinator Candi Smiley. She also reported to campus police, who then connected her with the Metropolitan Police Department of the District of Columbia.

54.     Plaintiff Doe 1 reported the rape to Ms. Smiley in specific detail.  She told Ms. Smiley that Assailant 1 lived in her dormitory, served in a position of authority as an RA, and was in two of her classes. She reported that after the rape, she did not feel safe continuing to see her assailant in her classes and her living space.

55.     Ms. Smiley told Plaintiff Doe 1 that she needed to provide a written statement and drafted the statement for her in the meeting.

56.     The full written statement drafted by Ms. Smiley read, "My name is [Jane Doe 1]. On February 7, 2016, [Assailant 1] raped me in my dorm room," even though Plaintiff Doe 1 had provided more detail to Ms. Smiley.

57.     Ms. Smiley told Plaintiff Doe 1 that Howard would transfer her assailant to a different dormitory.  Despite Plaintiff Doe 1's requests, Ms. Smiley said that she could not remove Assailant 1 from her classes. Assailant 1 continued to serve as an RA.

58.     Doe 1's assailant was transferred to a different dormitory.  With her rapist still in two of her classes, Plaintiff Doe 1 sought to take the classes remotely while the investigation into her rape was pending.

59.     On or around March 1, 2016, Ms. Smiley contacted Plaintiff Doe 1 to ask if she was discussing her rape in a group text message chain with her friends.  Plaintiff Doe 1 denied talking about her assault, and inquired as to who reported this to Ms. Smiley. She did not get an answer.  Plaintiff Doe 1 felt the tone of Smiley's words meant that she was somehow in trouble

for reporting her rape, and made her feel unsafe and targeted as a result of her report of sexual assault.

60.     Plaintiff Doe 1 believed that Assailant 1 was the individual who was the source of Smiley's inquiry.

61.     Ms. Smiley did not contact Plaintiff Doe 1 again for a month, despite Doe 1 reaching out to her to ask questions about the investigation into her assault and to follow-up on her question about the group text message.

62.     From March 1 through March 21, 2016, Plaintiff Doe 1 called Ms. Smiley four times but Smiley never returned her phone call or otherwise got in touch with her.

63.     On March 8, 2016, upon information and belief based on a report made by Plaintiff Doe 1's assailant, Howard Area Hall Manager Cole Heard fired Plaintiff Doe 1 from her position as an RA in College Hall South.

64.     Plaintiff Doe 1 explained that Assailant 1 had provided the information in retaliation for reporting her rape, but her termination stood.

65.     When terminated, realizing that her rapist was still an RA and she had lost her job because of her report of sexual assault, Plaintiff Doe 1 posted a tweet on Twitter expressing her frustration with how Howard was handling her report of sexual assault.

66.     On March 21, 2016, in response to her tweet, Plaintiff Doe 1 received multiple messages from other Howard students expressing their frustration with Howard's response to their complaints of sexual assault or harassment.

67.     Plaintiff Doe 1 began to privately message with many students who were sharing their stories of sexual assault.  One of those students, Plaintiff Jane Doe 2, confided that she was

also raped by Assailant 1 on Howard's campus last year, a rape which she reported to Howard in October 2015.

68.     As of March 21, 2016, when Plaintiffs Doe 1 and 2 first connected and realized they were raped by the same Howard student a year apart, Doe 2 had not heard from Ms. Smiley or any Howard employee regarding the investigation or resolution of her complaint of rape and harassment by a Howard student and RA in months.

69.     Nearly five months after being reported for rape, stalking, and sexual harassment, Assailant 1 was still an RA on Howard's campus.

70.     Plaintiff Doe 1 was raped by Assailant 1 three months after Howard was on notice of allegations that he had raped and continued to harass another Howard woman (Plaintiff Jane Doe 2).

71.     On March 22, 2016, after Plaintiff Doe 1's Twitter activity criticizing Howard's mishandling of her complaint of sexual assault, Howard released a press statement stating that "There has been an allegation of sexual assault committed by a Howard University student against another Howard student. The University administration is aware of the allegation and took immediate action as soon as we learned of this matter."

72.     Howard's statement was knowingly false.

73.     After her twitter activity, Dean Heath met with Plaintiff Doe 1 to discuss her report and let her know they were investigating her rape.  In that meeting, Dean Heath told Plaintiff Doe 1, in reference to her twitter post condemning Howard's sexual assault investigation policies, that "you embarrassed your family by doing that." This made Plaintiff feel stress and anxiety over her parent's reaction, fearing that her family may be embarrassed by her and she would lose her family support system.

74.     By her statement, Dean Heath discouraged and criticized Plaintiff Doe 1 for bringing unwanted public attention to Howard's deliberate indifference to reports of sexual assault.

75.     In April 2016, after her Twitter activity shed a light on Howard's deliberate indifference to Plaintiff Doe 1 and 2's report of sexual assault, upon information and belief, Ms. Smiley finalized the investigation into Doe 2's report and found that Assailant 1 had engaged in non-consensual sexual contact with Doe 2 and suspended him from campus for two years.  Howard never informed Plaintiff Doe 1 that her assailant was removed from campus.

76.     Upon information and belief, Assailant 1 transferred to Howard University from University of California Los Angeles ("UCLA") after a UCLA student accused him of similar sexual misconduct.

77.     Plaintiff Doe 1 still has not received an investigatory report or any information regarding the resolution of her claim.

78.     Over 450 days (15 months) have passed since Plaintiff Doe 1's report and she has still not received information regarding her report of rape.

79.     Howard was deliberately indifferent to Plaintiff Doe 1's report of sexual assault where it failed to investigate promptly.

80.     In violation of its Title IX Policy, Howard never provided to Plaintiff Doe 1 notification that additional time was needed to complete an investigation into her report of rape.

81.     If Howard had abided by its policy and timely investigated Plaintiff Doe 2's report of rape, harassment, and stalking, the investigation would have been completed by December 21, 2015.

82.     Howard only actively investigated Plaintiffs Does 1 and 2's complaints after public scrutiny because of Plaintiff Doe 1's Twitter activity.

16

83.     Howard's deliberate indifference to Plaintiff Doe 2's report of sexual assault, stalking, and harassment enabled Assailant 1 to continue in a position of authority as an RA on Howard's campus.

84.     Howard's deliberate indifference to Plaintiff Doe 2's report of sexual assault, stalking, and harassment enabled Assailant 1's continued residence in College Hall South, where Plaintiff Doe 1 worked and lived.

85.     Howard's deliberate indifference enabled Assailant 1 to rape Plaintiff Doe 1 in February 2016, over 100 days after Doe 2's reported to Ms. Smiley and Howard campus police that Assailant 1 raped her.

86.     Howard's deliberate indifference caused Plaintiff Doe 1 to become increasingly depressed after reporting the assault, constantly fearful that she would run into her rapist on campus.  Doe 1's grades suffered and she continues to experience fear and anxiety around the possibility of losing her scholarship.

87.     Plaintiff Doe 1 experienced depression and anxiety as the days passed without communication from Howard regarding any action to address Assailant 1's behavior and her complaint. She feared seeing her assailant on campus, particularly anxious because he was an RA and had increased access to dorms and facilities in this position of authority.

88.     On March 31, 2016, Plaintiff Doe 1 heard through a reporter that contacted her through Twitter that her assailant was expelled from Howard for misconduct unrelated to his assaults.  Plaintiff Doe 1 did not hear any information from Howard regarding her case or his removal from campus.

89.     On April 5, 2016, Plaintiff Doe 1 saw video footage of her assailant walking into her dormitory building.  She saw him walking in through the door adjacent to the parking lot.  The

17

only people that can enter through that door must have access entry on their account.  Those entering the dorm through that door must swipe their ID card to open the door.

90.     Plaintiff Doe 1's emotional anguish increased significantly when she was terminated from her position as an RA.    Her termination, precipitated by her rapist, meant that she now had financial concerns in addition to her worsening emotional health and related academic struggles.

91.     After learning of her termination from the RA program, Plaintiff Doe 1 protested that she thought the termination was in retaliation (now being enforced by Howard) for her report of sexual assault, given the source of the information on which Howard relied was her rapist, Assailant 1.

92.     Wilson Bland, Dean of Residence Life, told Plaintiff Doe 1 that her termination was just, and they would investigate to determine if she could apply again to be an RA in the following school year.

93.     On March 26, 2016, Plaintiff spoke with Smiley regarding her termination and feelings of retaliation for her report of sexual assault.  Smiley said she would look into whether she could be reinstated.

94.     Experiencing increasing difficulty from Howard, Plaintiff sought out the assistance of the Network for Victim Recovery DC ("NVRDC").  Upon contacting Candi Smiley on April 27, 2016, an attorney with NVRDC, Matthew Ornstein, was told to speak with the General Counsel's Office.  On April 28, 2016, Ornstein emailed Howard an executed release so that Howard could communicate with him regarding Plaintiff Doe 1's case and inquired into Plaintiff's ability to be reinstated in her role as an RA.

95.     On May 4, 2016, having not received any response from Howard, Mr. Ornstein emailed Howard's counsel to follow-up.  He again received no response.

96.     That day, Plaintiff went to speak with Wilson Bland, Dean of Residence Life to ask about the status of his investigation to learn whether she would be allowed to reapply to be an RA. Dean Bland advised that the matter had been referred to campus police for full investigation.

97.     On May 11, 2016, Mr. Ornstein emailed Howard again to ask for a status update and to request a copy of the information under investigation.

98.     On May 16, 2016, Mr. Ornstein spoke with a representative of Howard, who told him that the Residence Life was treating the matter strictly as a Human Resources issue not related to Plaintiff's complaint of sexual assault.  Though the deadline had passed for the initial application to be an RA in the next academic year, Howard said that because of Plaintiff's suspension she would meet with Residence Life to determine whether Plaintiff Doe 1 could submit her application now.  Mr. Ornstein reiterated, and Howard agreed, that this was appropriate given her suspension came about in retaliation by her assailant for reporting rape to Howard.

99.     On June 7, 2016, Plaintiff Doe 1 was given clearance to apply for a position as an RA for the 2016-2017 academic school year and was told Residence Life would be in touch regarding the application process.

100.    Having received no further response from Howard, on July 13, 2016, Plaintiff Doe 1 compiled what she believed to be the appropriate application materials and submitted her application.

101.    On July 25, 2016, with still no response from Howard, Mr. Ornstein emailed again to ask for an update.

102.     On July 28, 2016, with still no response from Howard, Mr. Ornstein again emailed for an update.

103.     Plaintiff Doe 1 spent the remained of the summer without any information or response from Howard regarding her application. Upon information and belief, all other RA applicants received a determination on their application and moved into their dormitory assignments on August 1.

104.     Plaintiff Doe 1's male friend who was also terminated with Plaintiff Doe 1 as a result of the same information from Assailant 1 had been admitted as an RA for the 2016-2017 school year by August 1.

105.     On August 2, 4, and 8, 2016, Plaintiff Doe 1 called Residence Life to inquire about the status of her application.  She left messages on all three occasions and did not hear back.

106.     On August 9, 2016, Plaintiff Doe 1 went to Howard's campus to visit the Office of Residence Life in person.  After waiting for an hour, Howard staff told her that unless she is "special" for some reason, she could not be an RA in the fall of 2016 because the RAs already underwent their annual training.  They said they would contact the Office of General Counsel and call Plaintiff Doe 1 regarding her application on August 10.

107.     Plaintiff Doe 1 did not receive a call or email from Residence Life regarding her application, as promised.

108.     After following up again, on August 12, Plaintiff Doe 1 received a call from Howard Residence Life stating that she could be an RA for the fall 2016 semester.

109.     Plaintiff Doe 1 went through RA training, moving in and beginning her position later than the other applicants because of Howard's delay.

110.     Without her RA position, Plaintiff Doe 1 would have had no choice but to commute to school daily from White Plains, Maryland – a distance of some 30 miles each way – because of the expense of living on or around Howard's campus.

111.     Repeatedly contacting Howard with no response, and knowing that all other RAs applications and work projects were moving forward, exacerbated Plaintiff's feelings of depression, anxiety, and betrayal.

112.     Plaintiff Doe 1 continues to struggle to receive support or academic accommodations from Howard, which threatens her scholarship and ability to continue her education.

### *Plaintiff Jane Doe 2*

113.     Jane Doe 2 enrolled as a student majoring in finance at Howard University in the fall of 2014.

114.     In early 2015, Plaintiff Doe 2 began dating Assailant 1.  On May 1, 2015, Assailant 1 raped Plaintiff Doe 2 in a parking garage on Howard's campus.

115.     After the assault, Plaintiff Doe 2 ended her relationship with Assailant 1.  She believed he was a senior at Howard and would be graduating that May. Thinking he would be gone from her life soon, she did not immediately report the assault.

116.     When Plaintiff Doe 2 returned to school in the fall of 2015, to her surprise, Assailant 1 was not only still a student at Howard, but also an RA in her dormitory.  Assailant 1 immediately began to harass and stalk Plaintiff Doe 2.  He frequently attempted to talk to her and her roommate about the sexual assault and would follow her when he saw her on campus. He also attempted to join student organizations to which Plaintiff Doe 2 was a member.

117.    After a month of enduring harassment by Assailant 1 and realizing he was not going to stop, Plaintiff Doe 2 reported her assault on October 17, 2015.  Not knowing who to speak with on Howard's campus, Plaintiff Doe 2 first reported to the Metropolitan Police Department of the District of Columbia. That day, the police called Howard because the assault took place on Howard's campus.

118.    On October 22, 2015, Plaintiff Doe 2 spoke with Ms. Smiley and reported the assault and subsequent harassment.

119.    On October 27, 2015, Plaintiff Doe 2 provided a detailed report of the assault and post-assault harassment to Smiley.  Plaintiff Doe 2 asked if Assailant 1 could be moved to another dorm, since he was currently the RA in her dormitory.  Smiley said she could not move Assailant 1 until the investigation was complete.

120.    RAs on Howard's campus have access to keys to all the rooms in their assigned dormitory building.  Plaintiff Doe 2 expressed her fear that as an RA, Assailant 1had access to her living quarters. In response to her concerns, Smiley told Plaintiff that RAs need to be finger printed to remove a key from the box. However, this did nothing to assuage Plaintiff's concerns because nothing prohibited him from getting a key to her room, Howard would just be able to identify him *after* he committed any act. Plaintiff continued to feel unsafe on campus.

121.    Not feeling safe with her assailant in a position of authority, Plaintiff Doe 2 moved into a different dormitory.  Howard told Plaintiff Doe 2 that she would not be charged for moving dormitories.

122.    On October 29, 2015, Plaintiff Doe 2 sent Ms. Smiley a detailed report of the assault by email and attached supporting text messages from Assailant 1 showing contemporaneous documentation of the rape and continued harassment.

123.    Through November and December 2015, Plaintiff Doe 2 heard nothing from Ms. Smiley or any other Howard administrator regarding her report of rape. Plaintiff Doe 2 became depressed and continued to feel unsafe on campus.

124.    As a result of her depression, anxiety, and sense of betrayal caused by the prolonged investigation, Plaintiff Doe 2 began to suffer in her studies and expected poor grades at the end of the semester.

125.    In mid-December 2015, Ms. Smiley asked Plaintiff Doe 2 to resend copies of the text messages she sent to her in October 2015.  After again sending the text messages, she did not hear back from Smiley in December.

126.    At the end of the fall semester of 2015, Plaintiff Doe 2 left Howard University.  Her grades were suffering because she was afraid to leave her dorm room and run into her assailant on campus, she was on the brink of losing her scholarship, and she was depressed.  She attempted to withdraw, contacting all the necessary offices at Howard.  She thereafter moved home to Alabama and sought to enroll in school there.

127.    Upon seeking to enroll in a new school, she realized that Howard charged her when she moved dormitories to no longer live in the same building as her rapist.  Howard also removed Doe 2's Pell grant and need-based scholarship from Plaintiff's transcript, so it appeared that she owed a significant amount of money.  As a result of this balance, Howard would not release her academic transcript which was required for her transfer applications.

128.    After much effort by Plaintiff Doe 2, Howard removed the hold on her account with regard to the Pell grant and need-based scholarship, but refused to remove the charge for moving dormitories.  Desperately wanting to continue her education, Plaintiff Doe 2 paid the balance for the dorm move and enrolled in an online program.

129.     Ultimately, because of inordinate delays by Howard, Plaintiff Doe 2 was not officially withdrawn from Howard until May 2016.

130.     In July 2016, Plaintiff Doe 2 sought to transfer academic programs and requested a transcript from Howard.  To her dismay, even though she was no longer a student at Howard, the amount owed absent the Pell grant and need-based scholarship were added back onto her Howard account.  With the balance, she was unable to receive a transcript and was forced to enroll in a different program even after attempting to resolve the issue numerous times with Howard.

131.     From July 2016 to February 2017, the Office of Bursar at Howard sent Plaintiff Doe 2 "delinquent balance hold" notices, which threatened to send the balance to a collection agency that institutes penalties.

132.     Plaintiff Doe 2 did not hear from Smiley or anyone at Howard regarding her assault until on or about March 24, 2016, following Plaintiff Doe 1's Twitter activity where she identified her assailant, the same individual who raped Doe 2.

133.     When Smiley contacted Doe 2 in March 2016, Plaintiff Doe 2 asked about the status of her investigation.  Ms. Smiley told her that she was still waiting for her to send the corroborating text message. Plaintiff Doe 2 had sent Ms. Smiley the text messages twice, most recently more than four months prior in December 2015, and asked her why she waited until now to reach out to Plaintiff Doe 2 if she did not receive them before.  Plaintiff Doe 2 sent the text message for a third time to Ms. Smiley.

134.     Plaintiff continued to feel like she could not return to Howard's campus, where Howard failed to follow its own policies related to Title IX and instead put a burden on the survivor of sexual assault to continuously follow up with the Title IX Coordinator to get action on her sexual assault report.

135.    In April 2016, Plaintiff Doe 2 received the investigatory report from Ms. Smiley addressing her report of sexual harassment and assault.  Ms. Smiley found that Assailant 1 had engaged in non-consensual sexual contact with Doe 2 and suspended him from campus for two years.

136.    From the date of her report, it took more than 170 days for Plaintiff Doe 2 to receive information regarding the investigation of her report of rape.

137.    Howard was deliberately indifferent to Plaintiff Doe 2's report of sexual assault where it failed to investigate promptly.

138.    Howard was deliberately indifferent to Plaintiff Doe 2's report of sexual assault where it failed to comply with its policy when it did not notify Plaintiff Doe 2 that additional time was needed to complete an investigation into her report of rape.

139.    Howard was deliberately indifferent to Plaintiff Doe 2's report of sexual assault where it failed to comply with its policy of completing an investigation of sexual assault within 60 days of a report.

140.    Howard retaliated against Plaintiff Doe 2 when it charged her for moving dormitories, continued to place inaccurate charges and holds on her account, and continued to inhibit her access to education despite her having unenrolled from Howard University.

141.    Howard's deliberate indifference and retaliation has had a significant and lasting impact on Plaintiff Doe 2.  As a result of feeling unsafe on campus, she was forced to leave Howard, her education was disrupted, and despite the desire to return to Howard to complete her education, she has anxiety and fear over Howard's ability to create a safe educational environment.

### *Plaintiff Jane Doe 3*

142.    Jane Doe 3 enrolled as a student at Howard University in the fall of 2013.  She is a student within the Reserve Officers' Training Corps ("ROTC") and has earned a full-scholarship to Howard as a part of that program.

143.    In 2013 and 2014, in addition to her studies and ROTC duties, Plaintiff Doe 3 maintained a part-time job at Starbucks.

144.    In March of 2014, Plaintiff Doe 3 met Howard University campus police officer Assailant 2, first through social media and then in person. Soon thereafter, in April 2014, Assailant 2 initiated a romantic relationship with Plaintiff Doe 3.

145.    Assailant 2 became aggressive with Plaintiff Doe 3, and started physically and sexually assaulting Plaintiff Doe 3.  Over the course of the relationship, Assailant 2 sexually assaulted Plaintiff Doe 3 multiple times, hit her, pushed her, strangled her, and threw things at her.

146.    Upon returning to campus in August 2014 after spending the summer at home in Maryland and at ROTC training, Assailant 2 continued to threaten Plaintiff Doe 3.  This frightened Plaintiff Doe 3 and the abuse continued.

147.    Plaintiff Doe 3 experienced sexual and other physical abuse at the hands of Assailant 2 through November 2014 when she reported the abuse to a close confidant who then went and reported the abuse to Howard's campus police.

148.    Investigator Thompson from Howard campus police came to Plaintiff Doe 3's job at Starbucks and asked if he could pick her up after work and take her to the Metropolitan Police Department. Plaintiff Doe 3 agreed and they went to a MPD precinct where she reported the assault.

149.    Candi Smiley was present at the MPD meeting, as well as Dr. Tricia Bent-Goodley, Director of Howard's Interpersonal Violence Prevention Center.

150.    After MPD concluded its interview with Plaintiff, Smiley told Plaintiff that if she needed academic accommodations or counseling to let her know how they (she and Bent-Goodley) could help.  Plaintiff said that she did not need academic accommodations because the semester was nearing a close, but that she was interested in counseling services.  Smiley said she could arrange counseling for Plaintiff.

151.    Smiley did not give Plaintiff information about counseling services.

152.    As the spring 2015 semester began, Plaintiff Doe 3 continued to pursue the availability of counseling.

153.    In January 2015, Plaintiff Doe 3 contacted several administrators within Howard's Interpersonal Violence Program and Counseling Centers to try and arrange counseling for herself. Two times she dropped by the Counseling Center, but the walk-in hours were extremely busy and she was unable to speak with anyone.

154.    Plaintiff Doe 3 eventually spoke with Dr. Ayana Watkins Northern, Director of the Counseling Center and expressed her immediate need for counseling and a preference that the counseling was private, not group counseling.  She did not hear back following that conversation.

155.    Plaintiff Doe 3 next contacted Dr. Bent-Goodley and Dr. Akosoa McFadgion.  Dr. McFadgion arranged an intake for Plaintiff Doe 3. During her intake interview with the Howard counselor, Plaintiff mentioned that she had a strong preference for individual counseling because she was having an extremely hard time processing the rape.  She also mentioned that she was extremely depressed, having a hard time getting out of bed to attend to her school and work responsibilities, and was suicidal. After conducting the intake, the intake counselor told Plaintiff that she would be contacted with counseling options after her case was presented to the counselors and that someone would check in with her over the weekend and the next week.

156.    No one from Howard contacted Plaintiff Doe 3 that weekend or next week about her counseling options.

157.    In February 2015, Plaintiff Doe 3 contacted the Interpersonal Violence Center and Counseling Center to follow up on the status of her receiving counseling, but left phone messages and when she was able to get in touch with an administrative employee, could not receive any substantive information regarding the status of her request for counseling.

158.    Plaintiff Doe 3 called Dr. McFadgion to try and get answers but she similarly was not able to determine the status of Plaintiff Doe 3's counseling request.

159.    After two weeks without information from Howard, desperate to receive help, Plaintiff Doe 3 contacted her ROTC advisor Captain Sarah Batista.  She confided in her that she was very depressed, needed help, and was not receiving the help she needed or answers on how to get the help she needed from Howard.

160.    Captain Batista, advisor for the District of Columbia ROTC region who is based out of George Washington University, directed Plaintiff to Dr. Skelton at George Washington University.  Plaintiff Doe 3 met with Dr. Skelton and described how she was depressed, suicidal, and in need of counseling services. Dr. Skelton reported that she could not counsel Plaintiff through George Washington University's program and seemingly shocked that Howard would ignore an intake that disclosed she was suicidal, called Howard on Plaintiff's behalf.

161.    Upon information and belief, Dr. Skelton was told that Plaintiff Doe 3 had to wait an additional week, despite the two weeks that had passed, to have her case presented.

162.    In mid-February, Plaintiff Doe 3 finally received a phone call from Dr. Jacqueline Darby of Howard's Interpersonal Violence Program about a group counseling session.  Plaintiff

reiterated that she did not feel comfortable in a group counseling session, and either way, the time and date of the group counseling session conflicted with her work schedule.

163.    Dr. Darby informed Plaintiff that if she did not attend the first three group counseling sessions, she would not be able to join the group.  Plaintiff reiterated that she knows this is not possible because of her work schedule.  Dr. Darby did not provide Plaintiff with any other counseling alternatives or suggestions on how to further pursue counseling given her circumstances.  Plaintiff attempted to rearrange her work schedule, knowing she needed counseling and was not being given other resources. She was unable to do so quickly enough and could not make the first three group counseling sessions.  She was left without help.

164.    Plaintiff Doe 3 has not been contacted since about any counseling options. Howard never provided Plaintiff Doe 3 information for individual counseling, despite her numerous requests and notification that she felt uncomfortable with group counseling.

165.    Howard's deliberate indifference to Plaintiff Doe 3's report of sexual assault continued in the face of the fact that she told multiple people over several weeks that she was experiencing suicidal ideation.

166.    Howard's deliberate indifference to Plaintiff Doe's report of sexual assault caused Plaintiff Doe 3's mental and emotional well-being to deteriorate in February and March 2015. Plaintiff Doe 3 continued to struggle to get out of bed to go to her classes and to work. At the end of February 2015, Plaintiff was fired from her job at Starbucks.

167.    In August 2016, Plaintiff Doe 3 went to the counseling center to request a copy of her medical records.  The receptionist told her that he did not think he could give her a copy because they typically only release documents to other clinicians.  He then told Plaintiff Doe 3 that

she should be careful with her records because people will "judge her" for her file, implying that she should be embarrassed by her request for medical treatment.

168.    The Howard counseling center employee's comment made Plaintiff Doe 3 feel upset and shocked.  She sought medical treatment for her anxiety and depression, did not receive the help she needed, and was now being told that people will judge her for the emotional harm she experienced because of Howard's behavior and her sexual assault.

169.    Without counseling services and the constant anxiety as a result of waiting for Howard to respond to Plaintiff's requests for counseling, in the beginning of April 2015, Plaintiff Doe 3 realized she needed academic accommodations.

170.    In the beginning of April 2015, Plaintiff realized her depression and anxiety were affecting her grades and ability to attend classes.

171.    Remembering Ms. Smiley and Dr. Bent-Goodley's statement that if she needed anything she could contact them, Plaintiff Doe 3 contacted Dr. Bent-Goodley and Dr. McFadgion to ask about academic accommodations.  They connected her to the Dean of Special Student Services, Elaine Heath.

172.    After describing her situation to Dean Heath, Plaintiff Doe 3 was provided a letter for her to give her professors. The letter stated they should consider providing her with testing accommodations, mainly extensions on her final exams that were approaching in the coming month. Specifically, the letter entitled "Letter of Accommodations" states the applicable law and thanks the professor for a "willingness to honor this request for accommodation."  The letter does not direct professors to consider or provide an accommodation.

173.    Plaintiff provided this letter to all of her professors and received exam extensions in all of her classes except for two.

174.   In response to the letter notifying her professors that she sought an accommodation under Title IX, Plaintiff Doe 3's statistics professor Ahmed Mohamed and biology professor William Gordon both told Plaintiff that it was too late for her to do anything to improve her grade and told her to withdraw from their classes.

175.   Shocked by their hostility to her request, Plaintiff Doe 3 tried to explain to both professors that she did not think she could withdraw from the classes because it would risk losing her ROTC scholarship. Neither Professor Gordon nor Professor Mohammed changed his mind.

176.   Plaintiff went back to Dean Heath seeking assistance with her two professors who refused to provide or engage in a conversation regarding an academic accommodation.

177.   Dean Heath told Plaintiff that all she can do is provide the letter requesting that professors provide an accommodation, but that it was ultimately up to the professors to decide whether to provide them or not.

178.   Plaintiff Doe 3 also contacted Dr. McFadgion, who was aware of her emotional well-being over the preceding months, to see if there was anything she could do to assist. Dr. McFadgion appeared supportive, conveying to Plaintiff that her professors had to provide accommodations under the law.  However, the issue remained unresolved.

179.   As a result of Howard's failure to provide Plaintiff Doe 3 a reasonable accommodation she failed her biology and statistics classes, and is at risk of losing her ROTC scholarship.

180.   After the close of the semester, in July 2015, Plaintiff Doe 3 sent an email to Howard President Wayne Frederick to express her concern with Howard's response to her report of sexual assault and request for reasonable accommodation to complete her courses during a semester where she was experiencing severe depression and not receiving support from Student

Affairs, the Counseling Center, or the Title IX Office. Weeks passed without a response to her email.

181.    During this same time, in October and December, 2015, Plaintiff's ROTC advisor Captain Culbertson also reached out to Candi Smiley to attempt to assist Plaintiff Doe 3 in her request for accommodations.

182.    Captain Culbertson similarly did not receive a response from Smiley.

183.    A few days following a third email to the President's Office, Plaintiff received a call from Candi Smiley. Smiley apologized for her experiences over the last few months and asked Plaintiff what she needed.  Plaintiff Doe 3 reported that she had an outstanding bill on her student account and could not register for classes because of a hold on her account. Smiley said she would connect her to someone in Financial Aid to assist and the issue was resolved.

184.    Captain Culbertson also eventually received a response from Smiley, who told her that they were investigating Plaintiff Doe 3's request regarding her grades.

185.    Howard's assault on Plaintiff Doe 3's ability to continue her education carried through the fall semester 2015 and spring semester 2016.

186.    In March 2016, Plaintiff Doe 3 felt betrayed and helpless in her communications with Howard and sought the help of Network of Victim Recovery District of Columbia. Kiera Bloore of NVRDC represented Plaintiff Doe 3 in her communications with Howard.

187.    On March 30, 2016, Ms. Bloore, Captain Culbertson, and Plaintiff Doe 3 met with Smiley regarding her failed classes and how she can retake them without further risking her ROTC scholarship. Ms. Smiley told them that Plaintiff had difficulty getting assistance with the two classes she failed last spring because she asked for help too late in the semester.  She affirmed Dean Heath's position that while teachers should provide reasonable accommodations, there was

not anything they could have done because she asked for help too late.  She stated that the school has limited ability to "force" teachers to provide reasonable accommodations.

188.     In that meeting, Ms. Smiley stated that she and Dr. Bent-Goodley are "willing to go to bat" for Plaintiff and see if there is a way she can make up the work and raise her grades in those two classes to either C's or D's so that her scholarship is no longer at risk.  Plaintiff requested that her F's be changed to Incompletes and that she be given make up work that will raise her grades enough for her to keep her ROTC scholarship.  Ms. Smiley said that she would look into this option and get back to Plaintiff with answers by next week, April 6.

189.     Ms. Bloore shared with Ms. Smiley the most significant cause of Plaintiff's concern over Howard's behavior – that she asked for counseling services when she first reported to the school and never received any, despite explaining to several people that she was suicidal.  Plaintiff Doe 3 asked for personal counseling services and was never provided any and the only option she was ever presented with was a group counseling session that she told the school conflicted with her work schedule and yet she was never given any alternatives.

190.     Ms. Bloore reported that due to that lack of counseling support, Plaintiff's grades suffered and she lost her job in April 2015.  Plaintiff's loss of income meant that she had not been able to pay off the balance of her student account.

191.     On April 22, 2016, Ms. Bloore sent Howard an email following up on the status of the incompletes and setting a meeting with the Provost or President.

192.     Having received no response, on April 26, 2016, Ms. Bloore sent another email following up on the status of the incompletes and setting a meeting with the Provost or President.

193.    On April 26, 2016, Howard's counsel responded to Ms. Bloore stating they could not locate a waiver or representation letter that allowed them to speak with Ms. Bloore about Plaintiff Doe 3.

194.    Disregarding the circumstances of Plaintiff Doe 3's sexual assault, counsel also stated that Plaintiff Doe 3 did not complete enough work to qualify for an incomplete in the two classes she failed. Counsel reported that Howard's policy for incompletes is that that the student must complete 60 to 80 percent of the work to qualify for an incomplete.

195.    On April 27, 2016, Ms. Bloore sent Howard the requested consent form and requested a teleconference to discuss the Incompletes the next day, April 28.

196.    On April 28, 2016, Ms. Bloore followed up, having not received a response, asking if Ms. Smiley or a representative from Howard were available for a teleconference.  She received no response.

197.    Ms. Bloore followed up again, leaving a voice message on May 19, 2016, to discuss Plaintiff Doe 3 Incompletes.  Ms. Bloore also followed up with an email.

198.    Having received no response, Ms. Bloore called and emailed again on May 26, 2016.  Howard responded via email, stating that they could set up a call next week to discuss the Incompletes and other academic accommodations or concerns Plaintiff had.

199.    Ms. Bloore responded asking for availability for a teleconference, proposing times.

200.    On May 31, 2016, having received no response from Howard, Ms. Bloore called and left a voice message requesting she contact her to set up a time to discuss Plaintiff Doe 3's concerns.

201.    On June 3, 2016, having received no response from Howard, Ms. Bloore called and left a voice message again requesting she contact her to set up a time to discuss Plaintiff Doe 3's concerns.

202.    On June 12, 2016, having received no response, Plaintiff Doe 3 emailed Ms. Smiley. Plaintiff's ROTC supervisor told her that the Provost was waiting to hear from her with times to meet. However, Ms. Smiley told Plaintiff she was going to get back to her with possible times to meet. Not wanting the Provost to feel she was responsible for the delay, Plaintiff sent a further email asking for a status update.

203.    Plaintiff received no response.

204.    On or around the beginning of June 2016, Plaintiff Doe 3 decided she would register for summer courses so that she could retake the classes she failed. Though she was hoping Howard would work with her to assign Incompletes so she could take the classes without additional cost to her, she felt like she had to move forward with summer courses so that she did not further risk her ROTC scholarship. At the time, she had $5,186.00 in her account, which was enough money to pay for nearly two classes. Plaintiff Doe 3 knew that she could work to make up the small differences in the cost of two classes and decided to register.

205.    When Plaintiff Doe 3 went to register for classes on or about June 15, 2016, and saw that her financial aid had depleted to $3,200.00, she called the financial aid office to ask why there had been a deduction. The financial aid office told Plaintiff Doe 3 that her account had been "adjusted."  When Plaintiff checked back against on or about June 22, 2016, her account reflected a $0 balance.

206.    Unable to register for classes without financial aid, and unable to receive information about these deductions, Plaintiff emailed Ms. Smiley and the financial aid office,

explaining that registration for summer classes happened this week and classes start on Monday. Plaintiff Doe 3 was not in a position to work to raise the full amount of tuition for the two classes and had planned her summer around taking these two courses, relying on the amount of financial aid available in her account.  She requested information about why her account had been depleted and requested a prompt response, with classes starting in a few short days.

207.    On June 27, 2016, Plaintiff received a response from the financial aid office stating shortly that she used her maximum aid eligibility during the fall and spring semesters, and therefore had no financial aid to use for summer classes.

208.    As a result, Plaintiff did not register for summer courses.  Plaintiff never received an answer about why her account was depleted and the reason behind periodic withdrawals of her resources after the spring semester ended.

209.    As a result, Plaintiff entered the fall 2016 semester with increased anxiety about the possibility of losing her ROTC scholarship. Without her scholarship, Plaintiff would be unable to attend Howard University.

210.    Hoping there was still a way to receive academic accommodations from Howard, Plaintiff and Ms. Bloore continued their outreach to Ms. Smiley and Howard's counsel to resolve Plaintiff's outstanding concerns.

211.    On July 12, 2016, Ms. Bloore reached out to Smiley and Howard's counsel again to follow up on Plaintiff's accommodation requests.  At that time, Ms. Bloore had not heard from Howard since May 26, despite multiple emails and phone calls in the interim.

212.    On July 20, 2016, Ms. Bloore sent Howard's counsel and Ms. Smiley an email outlining Plaintiff Doe 3's concerns.  The email included:

a.  "Back in the spring of 2015, Plaintiff Doe 3 asked for academic accommodations because she was struggling in her courses after having reported being assaulted by Officer Assailant 2, an HU officer.  However, her Biology 2 professor, Professor Gordon, refused to provide her with any academic accommodations.  As a result, Plaintiff Doe 3 failed that course, putting her ROTC scholarship at risk.  Plaintiff Doe 3 would like to receive an incomplete in Biology 2 and be permitted to complete any make-up assignments that would allow her to pass the course."

b.  "Next, this past spring semester Plaintiff Doe 3 took Chemistry 2 with Professor Talanova.  While Plaintiff Doe 3 completed a majority of the work in the class, her performance was poor because she continues to struggle with being on the campus where she was assaulted.  In addition, the continued difficulties Plaintiff Doe 3 has experienced with communicating and trying to receive support from the administration has caused her extreme stress since the spring of 2015. Plaintiff Doe 3 asked Professor Talanova if she could receive an incomplete in this course to provide her more time to complete the assignments at a passing level. Professor Talanova told Plaintiff Doe 3 that an incomplete in this course would not be approved and there was nothing she could do to assist Plaintiff Doe 3.  As a result, Plaintiff Doe 3 failed this course.  Plaintiff Doe 3 is asking for an incomplete in this course so that she can have the opportunity to pass this course and succeed."

c.  "Being assaulted by an HU officer created a highly hostile environment for Plaintiff Doe 3, which has caused her to struggle in her courses. Under Title IX, the University has an obligation to eliminate the hostile environment, prevent its recurrence and address its effects.  Part of addressing the effects of this hostile

environment is providing academic accommodations where they are reasonably available. We believe providing these two incompletes to Plaintiff Doe 3 are reasonable academic accommodations that the University is reasonably capable of providing."

213.    Neither Ms. Bloore nor Plaintiff received a response from Ms. Smiley or Howard's General Counsel's Office.

214.    Plaintiff Doe 3 began the fall semester 2016 at Howard and spends each day fearing her ROTC scholarship will be taken away.  She is now on probation and if her grades drop any further, her scholarship will be revoked.

215.    In regards to her assailant, Plaintiff heard from campus police that her assailant was terminated from his position at Howard University.  Plaintiff Doe 3 never received an update regarding her Title IX complaint.

216.    According to Howard's policy, Plaintiff Doe 3 should have received notification of the status of her report of sexual assault or resolution of the investigation within 60 days, which should have been in January 2015.  Plaintiff has still not received notification of the status of her report or resolution of the investigation into her complaint of sexual assault and physical abuse by a Howard police officer.

217.    Howard was deliberately indifferent to Plaintiff Doe 3's report of sexual assault and physical abuse where it failed to investigate promptly.

218.    Howard was deliberately indifferent to Plaintiff Doe 3's report of sexual assault where it failed to notify Plaintiff Doe 3 that additional time was needed to complete an investigation into her report of sexual assault and physical abuse.

219.    Howard was deliberately indifferent to Plaintiff Doe 3's report of sexual assault and physical abuse where it failed to complete an investigation within 60 days of her report.

220.    Howard's deliberate indifference caused Plaintiff Doe 3 to become increasingly depressed after reporting the assault, constantly fearful and anxious that she may lose her ROTC scholarship.

221.    Howard's deliberate indifference caused Plaintiff Doe 3 to experience depression, anxiety, and a sense of betrayal as the days passed without communication from Howard regarding her requests for counseling services.

222.    Plaintiff never received counseling services from Howard University despite repeated attempts and sharing with individuals in the counseling center that she was experiencing suicidal ideation.

223.    Plaintiff Doe 3 continues to struggle to receive support or secure academic accommodations from Howard, which threaten her scholarship and ability to continue her education.

### *Plaintiff Jane Doe 4*

224.    Jane Doe 4 started as a student at Howard University in August 2015.  She joined the ROTC program in the fall of 2016.

225.    Plaintiff Doe 4 met Howard student Assailant 3 on March 7, 2016.

226.    On March 9, 2016, Assailant 3 raped Plaintiff Doe 4 in his dorm room on Howard's campus.

227.    Plaintiff Doe 4 left after the assault, distraught and upset.  Assailant 3 texted her soon after she left and said, "my bad."

228.     Plaintiff Doe 4 reported the rape to Candi Smiley, Howard Title IX Coordinator, on March 10, 2016.   Smiley advised Plaintiff about available counseling services and the possibility of changing her assigned dormitory. Smiley gave Plaintiff Doe 4 a set of written handout materials. She did not mention or advise that Plaintiff seek medical attention.

229.     When reporting her rape to Smiley, Plaintiff Doe 4 requested that she be allowed to move dormitories as soon as possible.  Smiley told Plaintiff Doe 4 she could move to a different dorm and that she would be in touch regarding logistics and next steps. Smiley told Plaintiff that she would forward her information to the Dean for Special Student Services, Dr. Elaine Bourne Heath.

230.     Every day that passed following the assault, where Plaintiff Doe 4 continued to live in the dorm directly next to her rapist, had a significant impact on her ability to pursue her education.

231.     Plaintiff Doe 4 also requested a protective order that kept her rapist away from her when on campus.

232.     On March 11, 2016, Plaintiff Doe 4 received medical attention from Washington Hospital Center, which provides rape kits and exams conducted by Sexual Assault Nurse Examiners ("SANE").  Howard University Hospital and Howard University Student Health Center do not provide these services.

233.     Washington Hospital Center referred Plaintiff Doe 4 to an advocate and attorney from Network for Victim Recovery of DC ("NVRDC"), Jabeen Adawi.

234.     On March 14, 2016, Plaintiff Doe 4 followed up with Smiley regarding her request to move to a different dormitory.  Smiley reported that she shared Plaintiff's contact information with Dean Heath.  Having not heard from Dean Heath, Plaintiff Doe 4 called her the next day. =

235.    On March 17, 2016, Plaintiff Doe 4 spoke with Dean Heath and she conveyed the dorm that Plaintiff could move into.  Plaintiff Doe 4 moved the next day, a Friday.

236.    On March 17, 2016, after moving dorms, Plaintiff Doe 4 and Ms. Adawi went to Dean Heath's office to discuss academic accommodations. The office was completely closed and no one was answering the phone.

237.    On March 21, 2016, Plaintiff Doe 4 emailed Dean Heath to request academic accommodations with her Biology, African American Literature, and Persuasive Writing and Research courses.  She had deadlines in the three classes the week following the report of her assault and moving, and with everything going on, did not have the ability to focus on her course work.

238.    Having no response from Dean Heath, on March 22, 2016, Plaintiff Doe 4 and Ms. Adawi called Dean Heath's office. They were put on hold twice. Upon calling a third time, they were told that Dean Heath was in a meeting.

239.    Dean Heath, Plaintiff Doe 4, and Ms. Adawi met on March 23, 2016 to discuss academic accommodations.  Dean Heath gave Plaintiff Doe 4 a letter that she could show to her professors when requesting an accommodation.

240.    The letter Dean Heath gave to Plaintiff Doe 4, identical to the letter given to Plaintiff Doe 3, only encouraged professors to consider an accommodation.

241.    Plaintiff Doe 4 presented the letter to her biology professor, Dr. Gordon. The biology professor was only willing to move the exam two days, from March 23 to March 25, 2016.

242.    Later that day, Ms. Adawi emailed Dean Heath and Dr. Gordon to inform them that providing a two day extension is not an appropriate accommodation when a student is requesting

assistance following a traumatic event. Ms. Adawi requested a week extension to March 30, 2016 so that Plaintiff could prepare for the exam.

243.    Having not heard back from her professor or Dean Heath, Plaintiff Doe 4 went to Dean Heath's office to follow up on her request for an accommodation. Dean Heath pushed back, suggesting she take the exam the next day, March 25. Plaintiff Doe 4 explained that within the last two weeks, she was raped, reported to Howard and the police, and moved dorms. Plaintiff explained that she was not in the right mindset nor had she had the proper time to study. Dean Heath asked when Plaintiff wanted to take the exam, and she suggested the next week, April 1. Dean Heath again pushed back stating, "You know how Dr. Gordon is and we don't want to push him." They agreed Plaintiff would take the exam March 30 and Dean Heath said she would contact Plaintiff after speaking with Dr. Gordon.

244.    On March 29, 2016, the day before the exam, Plaintiff Doe 4 had not heard from Dean Heath or Dr. Gordon to confirm the exam or to set up necessary logistics for her to take the exam. Plaintiff Doe 4 emailed both Dr. Gordon and Dean Heath to confirm the exam for the following day.

245.    On March 30, 2016, the day Plaintiff was supposed to take the exam, Plaintiff Doe 4 went to speak with Dr. Gordon, having not received a response to her email. Dr. Gordon reported that he never heard from Dean Heath and agreed to let her take the test the following day.

246.    In addition to handling the emotional and physical response to a sexual assault, moving dorms, meeting with MPD, and coordinating course work, the inefficiencies and unresponsiveness from Howard added significant stress on Plaintiff's ability to continue her education.

247. Since the assault, because her rapist is a Howard student, Plaintiff Doe 4 saw him frequently. On at least four occasions in less than three weeks, Plaintiff Doe 4 saw him in the cafeteria or walking around campus to and from class.

248. On April 1, 2016, Smiley called Plaintiff to let her know that Assailant 3 received the letter notifying him of her complaint. Plaintiff reported to Smiley that she frequently sees her rapist around campus and knowing he is aware of her report, she feels increasingly unsafe on campus.  Plaintiff requested coordinating cafeteria and fitness center hours so that she no longer needs to constantly fear running into him in main locations on campus.

249. On April 1, 2016, Ms. Adawi emailed Smiley to set up a meeting to discuss this issue.

250. On April 4, 2016, Smiley responded, referring Plaintiff to her assistant to schedule an appointment, which she did, received no answer, and left a message.

251. On April 7, 2016, Smiley emailed Ms. Adawi, stating that she needed to contact the Office of General Counsel to obtain a representation form and then all communications will go through the General Counsel's Office. Ms. Adawi asked for contact information, and Smiley said that an attorney would contact her when she received the form.

252. That day, Ms. Adawi called the Office of General Counsel and spoke with an attorney.  Ms. Adawi sent her the required consent form that day and also inquired into a copy of the stay away order in effect between Plaintiff and her rapist Assailant 3. Plaintiff never received a copy of the document when Smiley began the investigation into her rape complaint.

253. Also in that communication on April 7, Ms. Adawi relayed that Plaintiff Doe 4 had repeatedly been crossing paths with her rapist and it did not appear like he was aware of or abiding by a stay away order.  She conveyed that this made Plaintiff's educational environment stressful

and upsetting, and made the use of any common areas available to all students, including those who had not experienced sexual assault or rape, like the fitness center or the cafeteria, challenging. Ms. Adawi requested that the parties be given separate times to use these common facilities so that Plaintiff could avail herself of the campus amenities without fear or anxiety.

254.    By April 13, 2016, Ms. Adawi or Plaintiff Doe 4 had received no response. Ms. Adawi followed up to check in.  Her email prompted a response from Howard's counsel, who forwarded a copy of the stay award order, but did not address any of the other concerns in Ms. Adawi's email.  Ms. Adawi was aware that the attorney was leaving her position at Howard, and responded to ask with whom she should correspond regarding Plaintiff Doe 4's ongoing concerns. She did not receive a response.

255.    On April 14, 2016, Smiley and Plaintiff Doe 4 corresponded about her interactions with her rapist on campus.  Smiley reported that the accused is not required to leave an area or change his direction because you are there. The stay away order only restricted his ability to speak directly to Plaintiff or indirectly to Plaintiff by asking people to contact Plaintiff on his behalf.  She then gave Plaintiff Doe 4 information for counseling services.

256.    Smiley did not acknowledge Plaintiff Doe 4's right to an accommodation under Title IX to assist in continuing her education free from any prejudice she may have due to the traumatic event of sexual assault.

257.    Smiley did not engage in any process to determine what accommodation may assist Plaintiff Doe 4 in her ability to continue her education without fear or anxiety stemming from her sexual assault.

258.    Smiley put a burden on Plaintiff Doe 4 that does not exist in the law and does not answer why Howard cannot provide reasonable accommodations by suggesting that Plaintiff Doe

4 needs to provide evidence of a threat in addition to the sexual assault she has already reported in order to obtain reasonable accommodations.

259.    Plaintiff Doe 4 felt desperate and upset at Howard's continued inadequate responses, failure to engage in a collaborative process that supported her education, and concern that the delay in responses meant that the semester was nearly complete.

260.    On April 22, 2016, Ms. Adawi wrote directly to Howard's counsel.  She reported that when she was corresponding with Howard's counsel, as directed by Smiley, and counsel only responded to half of her request (and provided the stay away order).  Counsel did not respond to the request to set up separate times for Plaintiff Doe 4 and her rapist to avail themselves of campus amenities.  Ms. Adawi reported that instead, Smiley emailed Plaintiff directly and did not copy her acknowledged attorney (Ms. Adawi).  This only created confusion and contradicted Smiley's previous mandate.

261.    Highlighting now two weeks had passed since Plaintiff Doe 4 reported that she felt unsafe on campus as she continued to cross paths with her assailant without resolution, Ms. Adawi again requested that the parties be given separate times to use these common facilities so that Plaintiff Doe 4 could avail herself of the campus amenities without exacerbating a hostile environment that is created by the presence of her assailant and continued anticipation and apprehension for resolution of her still-open Title IX investigation.

262.    Receiving no response five days later, Ms. Adawi sent Howard's counsel an email to follow-up on April 27.  Counsel did not respond.

263.    On April 28, 2016, Ms. Adawi emailed Howard's counsel again with an updated form needed to express Plaintiff's consent for Howard to speak with Ms. Adawi about her case, and request a response to Plaintiff's outstanding safety concerns. She did not respond.

264.     On May 17, 2016, neither Plaintiff Doe 4 nor Ms. Adawi had received a response from Howard's counsel or Ms. Smiley regarding her outstanding concerns.

265.     That day, Ms. Adawi emailed Ms. Smiley to inquire about the investigation into Plaintiff's complaint and March 10, 2016 report of rape by Assailant 3.  At that time, a week had passed from Howard's policy of resolution or written update within 60 days of a report of sexual assault.  Ms. Adawi asked that Smiley inform her and Plaintiff of the result or a status update as soon as possible.

266.     On May 18, 2016, Howard's counsel finally responded to Ms. Adawi's inquiry regarding the proper point of contact, Smiley or General Counsel's Office, and requested information about Plaintiff Doe 4's request for accommodations.

267.     On May 23, 2016, Keira Bloore from NVRDC contacted Howard's counsel, providing a new confidentiality release, and asking for an update on the status of the investigation. At this point, Howard was beyond the 60 day time frame for Title IX investigations.  Ms. Bloore also provided specific requests for academic accommodations, which included Doe 4's concerns about her safety on campus.

268.     Having received no response, Ms. Bloore called Ms. Arnold on May 25, 2016. She did not answer and Ms. Bloore left a message.

269.     Still having received no response, Ms. Bloore called Ms. Arnold on June 3, 2016. She did not answer and Ms. Bloore left a message.

270.     Still having received no response, Ms. Bloore emailed Ms. Arnold and Ms. Smiley on July 12, 2016.  She renewed Plaintiff's long-standing request for an accommodation so that she can use campus facilities without fear of running into her assailant while her Title IX investigation was still pending, now well-past the 60 day deadline.

271.     On July 12, Ms. Bloore finally received a response from Howard's counsel.  She stated that the University could address Plaintiff Doe 4's concern with respect to living in the same dorm as her assailant.  She then stated that Howard cannot address her request for schedule coordination absent an actual verbal or physical threat, insinuating that this needed to be an additional act other than her reported rape.

272.     On July 15, 2016, Bloore responded to Howard's counsel thanking her for her willingness to ensure that Plaintiff Does 4 and her assailant do not live in the same dorm.  Bloore also asked for clarification on why Plaintiff Doe 4's other requests for reasonable accommodation, that Plaintiff and her assailant coordinate use of key campus amenities, could not be met.

273.     Assailant 3 sexually assaulted Plaintiff Doe 4, which created a hostile environment for her on campus.  Under Title IX, Howard University has an obligation to eliminate the hostile environment, prevent its recurrence, and address its effects.  In addition, Howard University is required to provide interim accommodations if they are reasonably available.  This means that even prior to the University making a determination of whether the Respondent will be held responsible or not for the sexual assault, the University must provide interim accommodations if they are reasonably available.

274.     Howard put a burden on Plaintiff Doe 4 that does not exist in the law and does not answer why Howard cannot provide reasonable accommodations by suggesting that Plaintiff Doe 4 needs to provide evidence of a threat in addition to the sexual assault she has already reported in order to obtain reasonable accommodations.

275.     Howard had been on notice that Plaintiff Doe 4 felt unsafe on campus and was running into her assailant since April 2016 when Ms. Adawi explained how Plaintiff Doe 4 was

repeatedly crossing paths with the Respondent on campus following the assault, despite the stay away order, creating a continued hostile environment for her.

276.    Ms. Bloore made clear that Plaintiff was not asking that her assailant be barred from any common facilities on campus, just that that the parties be given separate times to utilize these facilities to help eliminate this hostile environment.  She laid out a suggested schedule.

277.    Neither Plaintiff Doe 4 nor Ms. Bloore received a response to this email.

278.    Howard failed to remedy an ongoing hostile educational environment where it refuses, without legitimate justification, to coordinate schedules so that Plaintiff can access campus amenities without fear.

279.    Plaintiff Doe 4's anxiety and fear that she would see her assailant on campus continued.

280.    In the beginning of August, Plaintiff Doe 4 learned through mutual friends that her assailant was assigned to the same dormitory as her, despite Howard's commitment that this would not happen.

281.    Learning that she may have to share housing with her rapist caused significant anxiety, stress, and a sense of betrayal, exacerbating an already emotionally trying situation.

282.    On August 8, 2016, Ms. Bloore emailed and called Howard's counsel to alert her to this urgent matter.  She referenced counsel's July 12 email, where she stated that Howard would ensure that Plaintiff Doe 4 and her assailant were not assigned to the same dorm. Howard failed to do so, creating an urgent issue for Plaintiff Doe 4, as she and other students were scheduled to move into dorms on August 18, 2016.

283.    The next day Ms. Bloore and Howard's counsel spoke via telephone and counsel acknowledged that this was an incorrect assignment and that she would alert Residence Life that

48

they should not be placed in the same dormitory. Counsel said she would let Ms. Bloore know when she heard back from them regarding a resolution.

284.    Having received no response from Howard's counsel or Ms. Smiley, Ms. Bloore sent a follow up email on August 11, 2016.  The email requested confirmation that Plaintiff Doe 4's assailant would not be living in the same dorm.

285.    Having received no response from Ms. Arnold or Ms. Smiley, Ms. Bloore followed up again on August 15.  She sought confirmation that Plaintiff Doe 4 could move into her dorm without fear that her assailant would be in the same facility. The students were three days away from moving into their dorms and Plaintiff Doe 4 still did not have an answer to her request to avoid living in the same dorm as her rapist.

286.    On August 15, Howard's counsel responded to Ms. Bloore's email and said she "believed" he would not be living on campus.  Counsel asked Ms. Smiley to confirm.

287.    By August 17, 2016, the day before Plaintiff was set to move back onto campus, Ms. Bloore still had not received confirmation from Ms. Smiley. Ms. Bloore again followed up by email.

288.    Howard's counsel responded on August 17 and confirmed that Plaintiff Doe 4's assailant is living on campus, but has been assigned to different housing.

289.    Plaintiff Doe 4 began the new semester without resolution of her Title IX complaint and continued her education in an active hostile environment.

290.    On August 23, 2016, just as Plaintiff was beginning the new semester at Howard, she received her Notice of Findings from Howard.  The letter is dated August 17, 2016 and states Howard's investigation found that the "evidence presented is sufficient to sustain a finding of

sexual violence in violation of the Title IX policy." The Notice of Findings suspended Assailant 3 for one semester. He would be eligible for readmission at Howard in the spring of 2017.

291. In October 2016, Plaintiff Doe 4 saw her assailant on campus at a Howard homecoming pep rally. She immediately approached a campus police officer to request his removal from campus. The campus police officer told her that Howard's Title IX Office does not communicate its findings with Campus Police and therefore Assailant 3 was not on the list of individuals banned from campus.

292. Once Plaintiff Doe 4 provided proof of his ban from campus by providing the finding letter to campus police, Assailant 3 was removed from the stadium. Despite a clear order banning Assailant 3 from campus, the process of proving Plaintiff's accusations and removing him from campus 40 minutes, and it was accomplished only when Plaintiff was able to find proof of the ban on her phone to show Howard campus police.

293. Despite enduring the lengthy process of Howard's investigation and lack of communication from Howard for its duration, Plaintiff Doe 4 was astonished and crestfallen that even after a finding against her assailant, he was still allowed on campus.

294. Howard has not provided any understanding to Plaintiff Doe 4 of why her assailant received a one semester suspension versus a longer suspension that would allow her to complete her education without fear of seeing him on campus.

295. According to Howard's policy of investigating and issuing a report within 60 days, Plaintiff Doe 4 should have received the resolution of her rape complaint by May 10, 2016. She never received a notification of the need for additional time to investigate.

296. Plaintiff received notice of findings in her case on August 23, 2016, more than 165 days after her report.

297.     Howard was deliberately indifferent to Plaintiff Doe 4's report of sexual assault where it failed to investigate promptly.

298.     Howard was deliberately indifferent to Plaintiff Doe 4's report of sexual assault where it failed to notify Plaintiff Doe 4 that additional time was needed to complete an investigation into her report of sexual assault.

299.     Howard was deliberately indifferent to Plaintiff Doe 4's report of sexual assault where it failed to complete an investigation within 60 days of her report.

300.     Howard's deliberate indifference caused Plaintiff Doe 4 to become increasingly depressed and anxious after reporting the assault, constantly fearful that she may see her assailant on campus.

301.     Howard's deliberate indifference caused Plaintiff Doe 4 to experience anxiety as the days passed without communication from Howard regarding her requests for accommodations and the status of her report.

302.     Plaintiff Doe 4 continues to struggle to receive support or academic accommodations from Howard, despite its acknowledgment that such accommodations would be appropriate under Title IX, which threatens her scholarship and ability to continue her education.

### *Plaintiff Jane Doe 5*

303.     Plaintiff Jane Doe 5 began as a student at Howard University in January 2013.

304.     On April 25, 2015, at a Howard party celebrating students' upcoming graduation, Plaintiff Doe 5 was raped by Assailant 4.

305.     The next morning, Plaintiff went to MedStar Washington Hospital and reported the rape to the Metropolitan Police Department.

306.    On April 29, 2015, Plaintiff met with a detective of the Metropolitan Police Department, who told Plaintiff Doe 5 that it would be in her best interest to go back home to Michigan to avoid any chance of retaliation from the assailant.

307.    On April 29, 2015, Plaintiff Doe 5 reported her sexual assault to Howard's Deputy Title IX Coordinator Candi Smiley.

308.    That same day, Plaintiff Doe 5 received notification that she was not able to graduate that semester.  No reason was provided in the letter from the Registrar's Office.  Upon Plaintiff's inquiry, she was able to determine that she was unable to graduate because she was six credits short of the requirement and not given notice of this issue before.

309.    Howard notified Doe 5 that she could appeal the decision.  Howard recently changed the policy that allowed for students to graduate if they were within 10 credits of the number needed to graduate, and since many students were relying on that rule, Howard conducted appeals on a case-by-case basis.

310.    On April 29, 2015, Plaintiff Doe 5 also met with Provost Dr. Terracita Powell.  She reported that she had been sexually assaulted and did not feel safe or comfortable on Howard's campus anymore.  She still hoped she would be able to graduate as planned in May 2015, but if she needed to take additional credits, Plaintiff requested accommodations to take those credits at a different school closer to her home in Michigan.

311.    Dr. Powell did not give Plaintiff Doe 5 any written information about the grievance process, accommodations, or counseling services.  Dr. Powell told Plaintiff to submit a written statement to the school.

312.    Plaintiff traveled home to Michigan and began to experience severe depression and suicidal ideation.

313.    In May 2015, Plaintiff sought representation from NVRDC advocates to assist with her requests for accommodations from Howard.  Plaintiff Doe 5 was represented by Ms. Kiera Bloore from NVRDC.

314.    On June 1, 2015, Howard informed Plaintiff Doe 5 that she needed to provide documentation including a police report that this incident happened before they would make a decision on providing reasonable accommodations. Plaintiff explained that she spoke with the Title IX Coordinator, Candi Smiley, who referred her to Dean Heath as a confidential resource who was supposed to provide the necessary information to Dr. Powell's office.

315.    Dean Heath told Plaintiff that she had sent Dr. Powell the necessary information on May 28.  Ms. Huff reported that Dr. Powell had not received the information.

316.    On June 2, 2015, Plaintiff Doe 5 received a voicemail from Candi Smiley saying that she could answer general questions but since Plaintiff has an attorney, she refers students to the general counsel's office. Plaintiff Doe 5 sent Smiley an email to follow up.

317.    Plaintiff Doe 5 and Ms. Bloore then called Howard's general counsel's office.  They were told that the General Counsel and the Deputy General Counsel were in a meeting, and spoke with an individual in the office named Stacy Smith.   She said she would let them know that Plaintiff called and have them call her back as soon as their meeting ended.

318.    Ms. Smiley (not counsel) called Plaintiff Doe 5 back shortly thereafter.  When Plaintiff asked if she could conference in Ms. Bloore, Smiley insisted that she could not speak with attorneys.  Ms. Smiley then said that she does not have any access to any more documentation to give to Dr. Powell that she has not already sent over to Dr. Powell's office.  Ms. Smiley directed Plaintiff to another attorney in the General Counsel's office and said the attorney would deal with Plaintiff Doe 5's accommodation requests moving forward.

319.    That day, June 2, 2015, Plaintiff Doe 5 and Ms. Bloore called the attorney.  The attorney reported to Plaintiff that Howard requires students' last 30 academic credits to be taken at the University.  Dr. Powell was looking into whether there was sufficient reason to waive that requirement.  Howard's attorney said she would move promptly to get a decision regarding Plaintiff Doe 5's credits, aware of the pressing deadline to register for summer courses.  The attorney also requested that Plaintiff Doe 5 send her a written summary of her sexual assault and the questions she has for Howard on Title IX.

320.    Dr. Powell then gave Plaintiff Doe 5 verbal permission to enroll in summer courses in Michigan.  The deadline for enrolling in summer courses was June 8, only a few days away, so Plaintiff enrolled that day.

321.    After the call from Dr. Powell, Plaintiff Doe 5 and Ms. Bloore called the attorney to thank her, ask how she would like to receive the summary information she requested, and set up an appointment to discuss Howard's grievance process.  They left a voice message.

322.    On June 28, 2015, Plaintiff Doe 5, Ms. Bloore, and the attorney discussed the Title IX grievance procedure, described to Plaintiff as follows:

   a.  Complainant meets with Title IX Coordinator and explains what happened, provides details and a witness list.

   b.  Title IX Coordinator contacts Respondent within 48 hours in person, via phone or email.  Respondent has 7 days to submit a response to Complainant's claims.

   c.  Title IX Coordinator then reviews Respondent's response and interviews any witnesses that she deems necessary to talk to.

   d.  Title IX Coordinator then puts together an investigation report with her recommendations.  This report is presented to the School's decisional body.

e. The Provost decides whether or not to affirm/modify/overturn the Title IX Coordinator's decision within 10 days.

323.    On July 1, 2015, Plaintiff Doe 5 sent her final statement of claims to Ms. Smiley and asked for an update on her investigation.

324.    On July 9, 2015, Smiley responded to Plaintiff Doe 5's inquiry and reported that she has not been able to contact the Respondent and therefore has not done much on the investigation.  She said she could reach out to other witnesses, but has not yet.  Now 71 days had passed since Plaintiff Doe 5's April 29 report of rape.

325.    At the time, Plaintiff Doe 5 was concerned that her assailant was aware of the police and school investigations and as a result, he would not come back to Howard and would attempt to transfer to another school.

326.    On July 17, 2015, Plaintiff Doe 5 and Ms. Bloore expressed this concern to Ms. Smiley and the attorney, and after multiple requests that something be done, they reported that (1) a hold had been placed on his account and (2) the Registrar's Office reports that there has not been any activity on his account in the past 90 days.

327.    During the summer of 2015, Plaintiff Doe 5 completed 14 credit hours, the full number of credit hours she needed to graduate from Howard.

328.    On September 14, 2015, Plaintiff Doe 5 emailed Dr. Powell with her summer transcripts.  She asked Dr. Powell to confirm receipt.

329.    Dr. Powell did not confirm receipt.  Plaintiff Doe 5 emailed again on September 21, 2015 to confirm she received her transcripts.  Dr. Powell responded and said she was checking with the Registrar's Office.

330.     On or about October 1, 2015, Plaintiff Doe 5 received an email from Candi Smiley notifying her that her assailant had returned to campus and that her investigation was moving forward.

331.     On October 14, 2015, Ms. Bloore and Plaintiff Doe 5 called Smiley.  They reported that Plaintiff Doe 5 still had not received confirmation from Dr. Powell regarding receipt of her transcripts.  They also asked Ms. Smiley questions about the status of her Title IX investigation. Smiley would not report on which witnesses she had contacted, but did say Plaintiff Doe 5 would have notification by mid-November.

332.     Plaintiff Doe 5 relied on this time frame established by Smiley.  She felt emotionally tied to that date, weighing significantly the closure she believed she would feel come mid-November.

333.     Plaintiff Doe 5 remained anxious and nervous regarding her graduation date, where Howard still had not confirmed receipt or approval of her summer transcripts.

334.     Plaintiff Doe 5 did not hear from Howard regarding the investigation in November.

335.     On December 2, 2015, Ms. Bloore called Ms. Smiley to follow up on the status of Plaintiff Doe 5's complaint.  Ms. Bloore left a voice message.

336.     Having received no response, Plaintiff Doe 5 and Ms. Bloore called Ms. Smiley again on December 9, 2015.  She did not answer, and they left a voice message.

337.     Ms. Smiley called Ms. Bloore and Plaintiff Doe 5 back on December 9, 2015.  She reported that her investigation found sufficient evidence to establish acts of sexual violence and her assailant was suspended from campus for two years.

338.     The investigation of Plaintiff Doe 5's report of rape took Howard 228 days (7 ½ months) to complete, more than three times the amount of time mandated by Howard policy.

339.    During that fall semester, despite being found guilty of sexual assault, Plaintiff Doe 5's assailant continued to attend classes on Howard's campus.

340.    Howard's deliberate indifference to the known presence of an accused sexual assault assailant on its campus for 7½ months endangered every female Howard student on campus.

341.    Throughout the time of the open investigation, Plaintiff feared return to Howard's campus, a possibility that remained open when the school continued to delay confirming her ability to graduate.

342.    Howard's deliberate indifference to the presence of the known assailant on its campus and the lack of action by Howard on Plaintiff Doe 5's complaint of sexual assault caused Plaintiff Doe 5 to experience anxiety and a sense of betrayal as the days passed without communication from Howard regarding her requests for accommodations and the status of her report.

343.    Howard was deliberately indifferent to Plaintiff Doe 5's report of sexual assault where it failed to investigate promptly.

344.    Howard was deliberately indifferent to Plaintiff Doe 5's report of sexual assault where it failed to notify Plaintiff Doe 5 that additional time was needed to complete an investigation into her report of sexual assault.

345.    Howard was deliberately indifferent to Plaintiff Doe 5's report of sexual assault where it failed to complete an investigation within 60 days of her report.

346.    Howard's deliberate indifference caused Plaintiff Doe 5 to become increasingly anxious after reporting the assault, constantly fearful and anxious that she may not be able to graduate with a degree from Howard.

347. Throughout this process, the criminal prosecution of Plaintiff Doe 5's rape report continued. On March 8, 2016, Ms. Bloore learned from the investigator at the Metropolitan Police Department that he was subpoenaing Howard's records related to Plaintiff Doe 5's Title IX investigation, which would likely be very helpful in her criminal case.

348. On May 23, 2016, the Metropolitan Police Department still had not received the subpoenaed records from Howard. Plaintiff Doe 5's criminal rape case stood at a stand-still because of Howard's failure to respond.

349. On April 25, 2016, Plaintiff finally received notice from Howard that she was eligible to graduate and her summer courses had been accepted. It took Howard over seven months to confirm it was accepting Plaintiff's reasonable accommodation to take courses off Howard's campus for fear of being on campus following her assault.

350. In November 2016, Plaintiff Doe 5 learned that her assailant was accused of raping another woman in the District of Columbia and in January 2017 pled guilty and was sentenced.

### *Plaintiff Jane Doe 6*

351. Plaintiff Jane Doe 6 enrolled as a student at Howard in August 2015.

352. On April 9, 2016, Plaintiff Doe 6 was raped by Assailant 5, a Howard University student, in his on-campus dormitory.

353. For a week following the rape, Doe 6 was distraught and unable to attend most of her classes.

354. During the weeks following the rape, Doe 6 did not want to leave her dormitory for fear of running into Assailant 5. A few days after the rape, Doe 6 left her dormitory and found Assailant 5 and three of his friends standing outside of her dormitory. Doe 6 immediately went

back inside and did not leave for another couple of days. On April 15, 2016, she left Howard's campus and went home to her parents' home out of state.

355.    After confiding in her parents that she had been assaulted, Doe 6 called Howard's emergency hotline to report the rape. Doe 6 told the dispatcher who answered her call that she did not want to return to school for the semester because she did not feel safe or comfortable on campus. The dispatcher encouraged Doe 6 to return to school, seek medical attention, and contact Dr. Bridgett S. Neamo, a Howard employee within its Counseling Services Center. Doe 6 contacted Dr. Neamo for counseling.

356.    Plaintiff Doe 6 returned to Howard's campus on April 18, 2016, and sought medical attention from Howard University Hospital. A representative from NVRDC and a detective from the MPD came to the hospital in response to Doe 6's report of rape. The NVRDC representative, Rochelle Kwan, gave Doe 6 the contact information for Howard's Title IX Coordinator and advised her to contact Dean Heath about academic accommodations for the week of classes she missed as a result of the rape.

357.    No Howard representative informed Doe 6 that she could request academic support following her report of rape. Doe 6 only knew to ask Dean Heath for an accommodation because Kwan told her of the available supportive resources and person to contact.

358.    That day, Plaintiff Doe 6 and her mother spoke with Dean Heath and reported the rape by Assailant 5. Doe 6 told Dean Heath that she was unable to attend classes the week following the rape and was missing class that day to seek medical attention and report the rape. She asked for her assistance in excusing her absences and speaking with her professors to make up the work she missed. Dean Heath asked Doe 6 to come back to see her on April 20, after she had reported the assault to Smiley and completed any further interviews with the MPD.

359.    On April 19, Plaintiff Doe 6 met with Smiley and reported her rape by Assailant 5.

360.    On April 20, 2016, as requested, Plaintiff Doe 6 returned to Dean Heath's office to speak with her about the academic support she needed in order to be able to continue her education despite her sexual assault.  Doe 6 missed classes after she was raped and when she was reporting the rape, and sought Dean Heath's assistance to make up the work missed so that she did not fall behind. Dean Heath was unavailable to speak with Doe 6.  With final exams approaching, these classes were important to Doe 6 because they included review materials and information about final grades.

361.    On April 21, Doe 6 met with Smiley again. In the meeting, Doe 6 gave Smiley the names and contact information of two supporting witnesses who told Doe 6 they were willing and available to discuss relevant information before or during the summer break. Contrary to Howard's policy, Smiley informed Doe 6 that investigations take three months and the investigation into her complaint would be on pause for the next few months because Doe 6 reported so close to the summer break. Doe 6 understood this to mean that Smiley would not attempt to contact the assailant to interview him and obtain his statement because it would be summer, without regard to whether her assailant was available to speak by phone or on or near campus over the summer. Smiley told Doe 6, "I wish you wouldn't have waited a week to report because we only have a few days left of school to investigate."

362.    On April 22, 2016, Plaintiff returned to Dean Heath's office to meet with her. This time, Dean Heath was there. She did not remember Doe 6. Doe 6 explained that she was raped, they met a few days ago, and that she needed assistance speaking with her professors about making up the work she missed and extending exam deadlines, which were only days away. Assailant 5 raped Doe 6 less than a month before finals, so the classes Doe 6 missed included information

about final exams, extra credit, and important end of the year deadlines. In order to successfully complete the semester, Doe 6 needed the opportunity to make up the work she missed and extend deadlines to prepare and take her final exams.

363.    In that meeting, Dean Heath gave Doe 6 a set of sealed envelopes that Dean Heath reported contained accommodation letters. Dean Heath told Doe 6 that it was up to the professors to decide if they would provide an accommodation. Doe 6 gave the letters to her professors.

364.    One professor, Ivor Livingston, would not accept Doe 6's assignments from the days she missed because of the rape. She completed the work prior to the assault, but missed the class on the day the work was due. Doe 6 attempted to turn in the work and he would not accept it for credit. Doe 6 approached him again with Dean Heath's letter and he still refused. The final assignment was worth a significant percentage of Doe 6's overall grade, and because of the professor's refusal, Doe 6's score dropped an entire letter grade.

365.    On May 2, 2016, Doe 6 emailed Smiley asking to meet with her before the summer break so she could have an understanding of the investigation process while she was gone for the summer. She had previously discussed concerns that she would not be able to live in College Hall South, the dorm primarily for sophomores, because her assailant was also a sophomore and she did not want to live in the same building as him. Smiley responded that that Doe 6 should have no issue moving into College Hall South. Given her expressed concerns, Doe 6 understood that to mean her assailant would not be assigned to the same dormitory building. Smiley said the investigation into Doe 6's complaint would be on hold during the summer because the summer period was approaching and students, including Assailant 5, left campus for the summer months, which therefore made them unreachable for an interview.

366.     Assailant 5 is a member of Howard's marching band and upon information and belief, spent the summer on Howard's campus and practicing with the band throughout June, July, and August 2016.

367.     During the summer 2016, Doe 6 did not hear from Howard's Title IX office regarding her complaint.

368.     In July 2016, Doe 6 repeated her concern that she would be living in the same dormitory as her assailant to Dr. Neamo in a counseling session. Dr. Neamo told Doe 6 that she would not be placed in the same dormitory as her rapist and assured Doe 6 that she would make sure it worked out.

369.     In mid-August 2016, Plaintiff Doe 6 saw Assailant 5's post on social media that said he was "all moved in" and contained a picture of College South Hall, the dorm to which Doe 6 was also assigned. Extremely distraught and anxious, Doe 6 and her mother quickly contacted Residence Director for College Hall South Kini Spady, Dr. Neamo, and Smiley.

370.     Howard did not inform Doe 6 that her assailant's dorm was reassigned until September 7, 2016. At this time, Spady told Doe 6 that Assailant 5 was banned from entering College Hall South.

371.     After she was told that Assailant 5 was banned from the dorm, in fall 2016, Doe 6 was walking toward the elevator in College Hall South. As she approached the elevator, she saw Assailant 5 and a group of his friends in the elevator. When she stopped abruptly, one of Assailant 5's friends said, "she's a pussy she won't get in." The other individuals, including Assailant 5, laughed loudly. Distraught, Doe 6 quickly turned away and took the stairs to her dorm room.

372.     On September 9, 2016, Smiley wrote to Doe 6 to tell her that the investigation into her complaint was "in full swing now" and that she would contact her if she had any questions.

This email came 143 days after Doe 6's report of rape. Smiley told Doe 6 to direct any questions regarding her investigation to Marcus Winder in Howard's Title IX Office.

373.    Because of the passage of time and the fact that her request to be assigned a different dorm than her assailant had been ignored, Plaintiff Doe 6 began to feel very depressed, anxious, and alone, feeling like Howard was not going to do anything to investigate her report of rape. Meanwhile, Doe 6 continued to see her assailant on campus at least once a week.

374.    Smiley did not contact Doe 6 again until Doe 6 reached out on October 25, 2016 to ask about the status of the investigation. Smiley responded, reporting that the "Title IX investigation is ongoing. As soon as the process is complete, you will be contacted so that we can schedule your Notice of Findings meeting." Smiley also stated that Winder had taken over the investigation of Doe 6's complaint.

375.    As of November 2017, a year later, no Notice of Findings meeting has been scheduled.

376.    On October 27, 2016, because Smiley told Doe 6 Winder was responsible for the investigation into her complaint, she called Winder to check in on the status of the investigation into her complaint. He did not answer or call Doe 6 back.

377.    On November 15, 2016, having not heard from the Title IX office, Doe 6's mother called Winder. He did not answer or call back.

378.    Around this time, in November 2016, Doe 6 continued to feel depressed and alone. She reached out to Dr. Neamo to schedule a counseling session. Dr. Neamo was unavailable. Howard Counseling Center told Doe 6 that Dr. Neamo was out on leave and would be out on leave for a few weeks' time.

379.     Doe 6 requested counseling services with another individual, and the counseling center told her she had to wait until Dr. Neamo returned to receive services because there were no other counselors available. As a result, Doe 6 went without services for the remainder of the fall 2016 semester. Her academics and emotional well-being continued to suffer.

380.     Returning to campus in January 2017, Plaintiff Doe 6 contacted Smiley for an update into the investigation into her case. Neither Doe 6 nor her mother heard back from Winder when they contacted him in the fall 2016, and they were desperate for information about Doe 6's complaint. At this point, over 260 days had passed since Doe 6's report.

381.     Although they were able to reach Smiley, Smiley did not have any information to share with Doe 6 and suggested she contact Winder for an update.

382.     On January 27, 2017, Doe 6's mother called Winder and left a message requesting a call back with information about the investigation into Doe 6's assault. She did not receive a call back.

383.     Doe 6 again called Winder on February 13, 2017, again was not able to reach him and left a message.

384.     Doe 6's distress, sadness, and anxiety increased with each day that Howard failed to complete the investigation into her complaint and failed to follow up with her continued outreach. In contrast, Doe 6 experienced no issues or delays when she contacted MPD regarding her investigation. Doe 6's witnesses reported that they were contacted by MPD as it investigated Doe 6's report of rape in the summer 2016, but never were interviewed by someone from Howard investigating the rape.

385.     From October 2016 to February 2017, Doe 6's mother called Winder eight times with no response.

386.     On February 24, 2017, Doe 6's mother reached Winder by telephone. She asked Winder to call Doe 6 and share an update, explaining that the longer Doe 6 went without information from Howard, the more distressed she became.

387.     That day, Winder and Doe 6 spoke on the telephone. Doe 6 told Winder how hard it was to get in touch with him. She reported that she continued to see her assailant on campus, which caused her anxiety, and asked about the status of the investigation into her complaint. Doe 6 explained to Winder that because she was told Howard would not take additional actions to protect her from seeing Assailant 5 until the investigation was complete, she wanted to know when she could anticipate resolution.

388.     While on the phone with Doe 6, Winder told Doe 6 he looked up her assailant's name in "the system" and Assailant 5 was no longer on campus. Doe 6 asked, but Winder did not tell her, the reason he was gone or when he left campus. She asked for an update on her case, but Winder did not report any update on the status of the investigation into her complaint of rape. Winder did not tell Doe 6 whether they had reached a finding regarding her complaint of rape, or when a finding could be expected. Winder did not share any information about whether her witnesses had been contacted or what investigation needed to be completed before Howard would reach its conclusion regarding her complaint.

389.     Although Winder had reported that Assailant 5 was no longer on campus, Doe 6 continued to see him on campus and hear from other students that he was still on campus attending classes and practicing with Howard's marching band. In the beginning of March 2017, Doe 6 saw Assailant 5 swiping a student ID card to enter the cafeteria. Assailant 5 was also in Miami, Florida for spring break with Howard students in March 2017.

390.    On April 19, 2017, exactly 365 days after Doe 6 reported her assault to Howard, the Residence Director for College Hall South Kini Spady called Doe 6 into her office and told her that Dean Heath needed to speak with her as soon as possible. Doe 6 attempted to meet with Dean Heath that day and was told she was unavailable.

391.    The next day, Spady again called Doe 6 into her office to tell her that she was banning Assailant 5 from the College Hall South. Doe 6 reported that she thought he was banned from her residence hall back in September 2016, and Spady reported that he was not banned up until that point.

392.    On April 20, 2017, Doe 6 attempted to meet with Dean Heath but she was unavailable again. Doe 6 returned on April 21 and met with Dean Heath. Doe 6 told Dean Heath she was not doing well, still not knowing the results of the investigation into her complaint. Dean Heath told Doe 6 that Assailant 5 raped another student and the school was "reopening" her case. Dean Heath told Doe 6 "don't worry, we are going to get on it. . . . we are going to move fast . . . we are going to nip this in the bud."

393.    Doe 6 was distraught and very upset, recognizing that if Howard had investigated her complaint a year earlier, it is possible another student would not have been assaulted. In addition to the distress she felt about Howard's continued delay on her own case, she now felt despair and anxiety for this other student. At this point, 367 days had passed since Doe 6 reported her rape to Howard.

394.    In June 2017, Doe 6 spoke with her former academic advisor Jerri Taylor. Doe 6 told Taylor about her rape in the fall of 2016. At that time, when reviewing Doe 6's academic transcript from the spring 2016, Taylor asked Doe 6 if anything had happened because she noticed a drop in her grade point average. Doe 6 then confided in Taylor that she was raped and could not

get the academic support she needed that semester to maintain her grades. After hearing that Doe 6 had issues receiving academic support, Taylor went to speak with Dean Heath on Doe 6's behalf.

395.    When Doe 6 spoke to Taylor in July 2017, Taylor told her that when she went to speak with Dean Heath to advocate on Doe 6's behalf back in August 2016, Dean Heath told Taylor that Assailant 5 already had several complaints of sexual violence against him so he should not be on campus much longer.

396.    Learning that Howard knew Assailant 5 had assaulted other students and let him remain on campus caused Doe 6 further emotional distress. Doe 6's distress increased when she learned that in August 2016, Dean Heath knew Assailant 5 had multiple complaints of sexual violence against him and 120 days had passed from Doe 6's report.

397.    Plaintiff Doe 6 returned to campus for the fall 2017 semester. She attempted to comfort herself by reasoning that Howard must have removed Assailant 5 from campus, in light of the multiple complaints from students that Assailant 5 had assaulted them.

398.    During the first week of classes on August 25, Doe 6 saw Assailant 5 coming out of a classroom on Howard's campus. Doe 6 was so shocked and upset that she felt physically ill and had to leave campus immediately.

399.    Doe 6 immediately emailed Dean Heath and Winder to ask why Assailant 5 was still on campus. In her email, she explained that Assailant 5 "was coming out of a classroom" and it "looked like he is attending classes at Howard!" Doe 6 told Heath and Winder that when she saw Assailant 5 on campus, "I felt immediately sick to my stomach and had to leave campus. I'm shocked and very upset. I can't feel safe on campus when you're telling me one thing and then I see him during the first week of school."

400.     Dean Heath responded and asked Doe 6 to call her. Doe 6 called Dean Heath but she did not answer. Winder did not reply to the email.

401.     Almost a month passed without a response.

402.     Doe 6 sent a follow up email to Heath and Winder on September 21, 2017. In her email, Doe 6 asked Dean Heath to call her or let her know a time they could speak. She also asked Winder to "let me know why [Assailant 5] is on campus, what has been done to investigate my complaint, and when I can expect to hear about the outcome. Please also let me know what can be done now so that I don't have to fear running into [Assailant 5] on campus."

403.     Winder responded on September 21, stating "respondent, [Assailant 5], from your Title IX complaint was suspended from Howard University for Fall 2016 and Spring 2017." Winder did not answer Doe 6's questions about her complaint or Assailant 5's presence on campus.

404.     Doe 6 responded to Winder on September 26, 2017, explaining that Assailant 5 could not have been suspended from Howard in fall 2016 as a result of her complaint for multiple reasons:

> "If [Assailant 5] was suspended for the fall 2016 semester, it could not have been as a response to my complaint because Ms. Smiley told me the investigation of my complaint was just getting started in September and was still going on in late October that year. Also, [Assailant 5] was originally assigned to the same dorm building as me for the fall 2016 semester, so how could he have been suspended?"

405.     Winder responded to Doe 6's email stating that her "case closed nearing the end of the Fall 2016 semester." Yet he maintained that the Assailant had been suspended "from the Fall 2016 and Spring 2017 semesters."

406.     Despite Winder's assertion that Doe 6's "case closed" in Fall 2016, Howard did not send Doe 6 a notification that her report of rape was fully investigated. Howard did not send Doe 6 a completed Report of Investigation. Howard did not contact Doe 6 to schedule a Findings

Meeting nor did they conduct such a meeting with Doe 6. Howard did not apprise Doe 6 of the outcome of her report or any sanctions rendered by the Provost.

407.    Winder's response to Doe 6's September 26 email is the first indication anyone at Howard gave her that the investigation into her complaint had ended. Howard did not convey to Doe 6 that her case was closed at any time prior to September 2017, including when Doe 6 specifically asked for an update in October 2016 and January and February 2017. *See supra* ¶¶ 374, 380-388.

408.    Winder again did not respond to or acknowledge Doe 6's comment that Assailant 5 is a student on campus despite having assaulted other women in addition to herself. He did not respond to or acknowledge her upset and distress over seeing him on campus.

409.    Doe 6 continues to see Assailant 5 on campus at least once a week, despite her attempts to avoid him. Every time she sees Assailant 5, he stares at her. Three or four times, Assailant 5 was with friends and Doe 6 saw them staring at her, talking, and overheard them say her name.

410.    In October 2017, Doe 6 saw Assailant 5 with a group of friends and changed course to avoid them. She turned around twice and saw that they were following her, staring at her, and appeared to be talking about her.

411.    When Doe 6 sees Assailant 5 on campus, she becomes scared and sometimes physically sick. In many instances, she has retreated to her apartment because she is afraid to continue to be on Howard's campus. As a result, Doe 6 missed classes and planned extracurricular activities. This has disrupted her education and her ability to attend classes in a harassment-free environment.

412.     As a result of the continued harassment from Assailant 5, with no response or acknowledgement of her concerns from Howard, Doe 6's emotional distress worsened. Doe 6 continues to have a hard time being on Howard's campus, constantly fearing she will see her assailant and experience harassment. Doe 6 feels like no administrator at Howard will help lessen her active hostile educational environment.

413.     Howard was deliberately indifferent to Plaintiff Doe 6's report of sexual assault where it failed to take measures to reduce the harmful effect of Doe 6's rape on her ability to access her education, such as by promptly investigating her report of sexual assault, taking measures to prevent Assailant 5 from committing assault against Doe 6 and other students, or providing Doe with adequate academic or mental health support.

414.     Howard was deliberately indifferent to Plaintiff Doe 6's report of sexual assault where it failed to investigate promptly.

415.     Howard was deliberately indifferent to Plaintiff Doe 6's report of sexual assault where it failed to notify Plaintiff Doe 6 that additional time was needed to complete an investigation into her report of sexual assault.

416.     Howard was deliberately indifferent to Plaintiff Doe 6's report of sexual assault where it failed to complete an investigation within 60 days of her report.

417.     Howard was deliberately indifferent to Plaintiff Doe 6's report of sexual assault where it still has not given Doe 6 a report of investigation into her complaint, despite the passage of more than 500 days.

418.     Howard's deliberate indifference caused Plaintiff Doe 6 to become increasingly depressed and anxious after reporting the assault, constantly fearful that she may see her assailant on campus.

419.     Howard's failure to investigate, ongoing lack of responsiveness to Plaintiff Doe 6's concerns, and failure to take any steps visible to Doe 6, caused Plaintiff Doe 6 to experience anxiety.

420.     Plaintiff Doe 6 continues to struggle to receive support from Howard and remains without resolution of her complaint, further threatening her ability to continue her education.

## COUNT ONE

### (Discrimination in violation of Title IX of the Education Amendments of 1972 Plaintiff Doe 1)

421.     Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-420 of this Complaint with the same force and vigor as if set out here in full.

422.     Plaintiff Doe 1 reported a sexual assault by a Howard student on Howard's campus, in violation of her right to an educational environment free from sex discrimination under Title IX.

423.     The harassment was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities or benefits provided by the school.

424.     Howard's response to reports of sexual assault amounts to an official policy of sex discrimination.

425.     Howard University had knowledge of Plaintiff Doe 1's complaint of sexual assault, the name of her rapist, and the details of the sexual violence.

426.     Howard University acted with deliberate indifference to Plaintiff Doe 1's complaint of sexual assault where it had knowledge that her assailant had raped another Howard student four months prior to Plaintiff's assault.

427.    Howard University acted with deliberate indifference to Plaintiff Doe 1's complaint of sexual assault where it failed to provide her with reasonable accommodations as measures to lessen the hostile educational environment on Howard's campus.

428.    Howard University acts with deliberate indifference to Plaintiff Doe 1's complaint of sexual assault where is continues to fail to provide reasonable accommodations to Plaintiff, threatening her awarded scholarship.

429.    Howard University acted with deliberate indifference to Plaintiff Doe 1's complaint of sexual assault where it failed to provide her with reasonable accommodations so that she could complete and succeed in her course work.

430.    Howard University acted with deliberate indifference to Plaintiff Doe 1's complaint of sexual assault where it violated its own policy and Title IX by failing to promptly investigate complaints of sexual assault.

431.    Howard was deliberately indifferent to Plaintiff Doe 1's report of sexual assault where it failed to notify Plaintiff Doe 1 that additional time was needed to complete an investigation into her report of sexual assault.

432.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff was denied or limited in her ability to participate in or benefit from the school's educational programs or activities on the basis of sex.

433.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff suffered and continues to suffer lost earnings, employment and educational benefits, emotional pain, suffering, personal embarrassment, humiliation, and loss of enjoyment of life.

## COUNT TWO

**(Retaliation in violation of Title IX of the Education Amendments of 1972
Plaintiff Doe 1)**

434.     Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-420 of this Complaint with the same force and vigor as if set out here in full.

435.     Howard University had knowledge of Plaintiff Doe 1's sexual assault, the name of her rapist, and the details of the sexual violence.

436.     Plaintiff Doe 1 engaged in legally protected activity when she reported her sexual assault by a Howard student on Howard campus to Howard administrators.

437.     Shortly thereafter, Plaintiff Doe 1's rapist reported her to campus housing authorities for an alleged violation of Howard policy, engaging in an act of retaliation against her for reporting the assault.

438.     Howard University retaliated against Plaintiff Doe 1 when it fired her from her position as a Resident Assistant because of her assailant's allegations, showing knowing and willful disregard for the suspect origin of the allegations by Plaintiff Doe 1's rapist that formed the basis for firing her.

439.     Plaintiff Doe 1's assailant remained in his position as a Resident Assistant, deepening the feeling of retaliation and anxiety and further injuring Plaintiff Doe 1.

440.     As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 1 suffered and continues to suffer lost earnings, employment and educational benefits, emotional pain, suffering, personal embarrassment, humiliation, and loss of enjoyment of life.

### COUNT THREE

### (Discrimination in violation of Title IX of the Education Amendments of 1972
### Plaintiff Doe 2)

441.     Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-420 of this Complaint with the same force and vigor as if set out here in full.

442.    Plaintiff Doe 2 reported a sexual assault by a Howard student on Howard campus, in violation of her right to an educational environment free from sex discrimination under Title IX.

443.    The harassment was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities or benefits provided by the school.

444.    Howard's response to reports of sexual assault amounts to an official policy of sex discrimination.

445.    Howard University had knowledge of Plaintiff Doe 2's complaint of sexual assault, the name of her rapist, and the details of the sexual violence.

446.    Howard University acted with deliberate indifference to Plaintiff Doe 2's complaint of sexual assault where it had knowledge that her assailant subsequently raped another Howard student and still failed to complete a timely investigation.

447.    Howard University acted with deliberate indifference to Plaintiff Doe 2's complaint of sexual assault where it failed to provide her with reasonable accommodations as measures to lessen the hostile educational environment on Howard's campus.

448.    Howard University acted with deliberate indifference to Plaintiff Doe 2's complaint of sexual assault where it failed to provide her with reasonable accommodations so that she could complete and succeed in her course work.

449.    Howard University acted with deliberate indifference to Plaintiff Doe 2's complaint of sexual assault where it violated its own policy and Title IX by failing to promptly investigate complaints of sexual assault.

450.   Howard was deliberately indifferent to Plaintiff Doe 2's report of sexual assault where it failed to notify Plaintiff Doe 2 that additional time was needed to complete an investigation into her report of sexual assault.

451.   As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 2 was denied or limited in her ability to participate in or benefit from the school's educational programs or activities on the basis of sex.

452.   As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 2 suffered and continues to suffer lost earnings, employment and educational benefits, emotional pain, suffering, personal embarrassment, humiliation, and loss of enjoyment of life.

## COUNT FOUR

**(Retaliation in violation of Title IX of the Education Amendments of 1972 Plaintiff Doe 2)**

453.   Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-420 of this Complaint with the same force and vigor as if set out here in full.

454.   Plaintiff Doe 2 engaged in activity protected under Title IX when she reported a sexual assault by a Howard student on Howard campus, in violation of her right to an educational environment free from sex discrimination under Title IX.

455.   Howard University had knowledge of Plaintiff Doe 2's complaint of sexual assault, the name of her rapist, and the details of the sexual violence.

456.   Howard University retaliated against Plaintiff Doe 2 for her complaint of sexual assault where it had knowledge that her assailant subsequently raped another Howard student and still failed to complete a timely investigation.

457.    Howard University retaliated against Plaintiff Doe 2 for her complaint of sexual assault where it failed to provide her with reasonable accommodations as measures to lessen the hostile educational environment on Howard's campus.

458.    Howard University retaliated against Plaintiff Doe 2 for her complaint of sexual assault where it charged her for the cost of changing dormitories when she felt unsafe on campus because her assailant was an authority figure in her dormitory.

459.    Howard University retaliated against Plaintiff Doe 2 for her complaint of sexual assault where it violated its own policy and Title IX by failing to promptly investigate complaints of sexual assault.

460.    Howard University retaliated against Plaintiff Doe 2 for her of sexual assault where it continued to denied or limited in her ability to participate in or benefit from the school's educational programs or activities on the basis of sex, even after she was no longer a student at Howard University.

461.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 2 was denied or limited in her ability to participate in or benefit from the school's educational programs or activities on the basis of sex.

462.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 2 suffered and continues to suffer lost earnings, employment and educational benefits, emotional pain, suffering, personal embarrassment, humiliation, and loss of enjoyment of life.

## COUNT FIVE

### (Discrimination in violation of Title IX of the Education Amendments of 1972 Plaintiff Doe 3)

463.    Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-420 of this Complaint with the same force and vigor as if set out here in full.

76

464.     Plaintiff Doe 3 reported a sexual assault by a Howard Police Officer on and around Howard campus over an extended period of time, in violation of her right to an educational environment free from sex discrimination under Title IX.

465.     The harassment was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities or benefits provided by the school.

466.     Howard's response to reports of sexual assault amounts to an official policy of sex discrimination.

467.     Howard University had knowledge of Plaintiff Doe 3's complaint of sexual assault, the name of her rapist, and the details of the sexual violence.

468.     Howard University acted with deliberate indifference to Plaintiff Doe 3's complaint of sexual assault where it failed to provide her with counseling services or information on how to receive counseling services despite multiple requests and reports that she was experiencing suicidal ideation.

469.     Howard University acted with deliberate indifference to Plaintiff Doe 3's complaint of sexual assault where it failed to provide her with reasonable accommodations as measures to lessen the hostile educational environment on Howard's campus.

470.     Howard University acted with deliberate indifference to Plaintiff Doe 3's complaint of sexual assault where it failed to provide her with reasonable accommodations so that she could complete and succeed in her course work.

471.     Howard University acted with deliberate indifference to Plaintiff Doe 3's complaint of sexual assault where is violated its own policy and Title IX by failing to promptly investigate complaints of sexual assault.

472.    Howard was deliberately indifferent to Plaintiff Doe 3's report of sexual assault where it failed to notify Plaintiff Doe 3 that additional time was needed to complete an investigation into her report of sexual assault and physical abuse.

473.    Howard University acts with deliberate indifference to Plaintiff Doe 3's complaint of sexual assault where it continues to fail to provide reasonable accommodations to Plaintiff, threatening her awarded scholarship.

474.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 3 was denied or limited in her ability to participate in or benefit from the school's educational programs or activities on the basis of sex.

475.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 3 suffered and continues to suffer lost earnings, employment and educational benefits, emotional pain, suffering, personal embarrassment, humiliation, and loss of enjoyment of life.

## COUNT SIX

### (Discrimination in violation of Title IX of the Education Amendments of 1972 Plaintiff Doe 4)

476.    Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-420 of this Complaint with the same force and vigor as if set out here in full.

477.    Plaintiff Doe 4 reported a sexual assault by a Howard student on Howard campus, in violation of her right to an educational environment free from sex discrimination under Title IX.

478.    The harassment was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities or benefits provided by the school.

479.    Howard's response to reports of sexual assault amounts to an official policy of sex discrimination.

480.    Howard University had knowledge of Plaintiff Doe 4's complaint of sexual assault, the name of her rapist, and the details of the sexual violence.

481.    Howard University acted with deliberate indifference to Plaintiff Doe 4's complaint of sexual assault where it failed to provide her with reasonable accommodations to the continued trauma of seeing her assailant on campus while her complaint was under investigation.

482.    Howard University acted with deliberate indifference to Plaintiff Doe 4's complaint of sexual assault where it failed to provide her with reasonable accommodations as measures to lessen the hostile educational environment on Howard's campus.

483.    Howard University acted with deliberate indifference to Plaintiff Doe 4's complaint of sexual assault where it failed to provide her with reasonable accommodations so that she could complete and succeed in her course work.

484.    Howard University acted with deliberate indifference to Plaintiff Doe 4's complaint of sexual assault where it violated its own policy and Title IX by failing to promptly investigate complaints of sexual assault.

485.    Howard was deliberately indifferent to Plaintiff Doe 4's report of sexual assault where it failed to notify Plaintiff Doe 4 that additional time was needed to complete an investigation into her report of sexual assault.

486.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 4 was denied or limited in her ability to participate in or benefit from the school's educational programs or activities on the basis of sex.

487.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 4 suffered and continues to suffer lost earnings, employment and educational benefits, emotional pain, suffering, personal embarrassment, humiliation, and loss of enjoyment of life.

## COUNT SEVEN

**(Discrimination in violation of Title IX of the Education Amendments of 1972
Plaintiff Doe 5)**

488.     Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-420 of this Complaint with the same force and vigor as if set out here in full.

489.     Plaintiff Doe 5 reported a sexual assault by a Howard student, in violation of her right to an educational environment free from sex discrimination under Title IX.

490.     The harassment was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities or benefits provided by the school.

491.     Howard's response to reports of sexual assault amounts to an official policy of sex discrimination.

492.     Howard University had knowledge of Plaintiff Doe 5's complaint of sexual assault, the name of her rapist, and the details of the sexual violence.

493.     Howard University acted with deliberate indifference to Plaintiff Doe 5's complaint of sexual assault where it failed to provide her with reasonable accommodations to the continued trauma of seeing her assailant on campus while her complaint was under investigation.

494.     Howard University acted with deliberate indifference to Plaintiff Doe 5's complaint of sexual assault where it failed to provide her with reasonable accommodations so that she could complete and succeed in her course work.

495.     Howard University acted with deliberate indifference to Plaintiff Doe 5's complaint of sexual assault where it failed to respond or approve reasonable accommodations to allow Plaintiff graduate timely following her complaint of sexual assault.

496.    Howard University acted with deliberate indifference to Plaintiff Doe 5's complaint of sexual assault where it violated its own policy and Title IX by failing to promptly investigate complaints of sexual assault.

497.    Howard was deliberately indifferent to Plaintiff Doe 5's report of sexual assault where it failed to notify Plaintiff Doe 5 that additional time was needed to complete an investigation into her report of sexual assault.

498.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 5 was denied or limited in her ability to participate in or benefit from the school's educational programs or activities on the basis of sex.

499.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 5 suffered and continues to suffer lost earnings, employment and educational benefits, emotional pain, suffering, personal embarrassment, humiliation, and loss of enjoyment of life.

## COUNT EIGHT

### (Retaliation in violation of Title IX of the Education Amendments of 1972 Plaintiff Doe 5)

500.    Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-420 of this Complaint with the same force and vigor as if set out here in full.

501.    Plaintiff Doe 5 engaged in activity protected under Title IX when she reported a sexual assault by a Howard student, in violation of her right to an educational environment free from sex discrimination under Title IX.

502.    Howard University had knowledge of Plaintiff Doe 5's complaint of sexual assault, the name of her rapist, and the details of the sexual violence.

503.    Howard University retaliated against Plaintiff Doe 5 for her complaint of sexual assault where it failed to provide her with reasonable accommodations so that she could complete and succeed in her course work.

504.    Howard University retaliated against Plaintiff Doe 5 for her complaint of sexual assault where it failed to respond or approve reasonable accommodations to allow Plaintiff graduate timely following her complaint of sexual assault.

505.    Howard University retaliated against Plaintiff Doe 5 for her complaint of sexual assault where it violated its own policy and Title IX by failing to promptly investigate complaints of sexual assault.

506.    Howard retaliated against Plaintiff Doe 5 for her complaint of sexual assault where it failed to notify Plaintiff Doe 5 that additional time was needed to complete an investigation into her report of sexual assault.

507.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 5 was denied or limited in her ability to participate in or benefit from the school's educational programs or activities on the basis of sex.

508.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 5 suffered and continues to suffer lost earnings, employment and educational benefits, emotional pain, suffering, personal embarrassment, humiliation, and loss of enjoyment.

## COUNT NINE

### (Discrimination in violation of Title IX of the Education Amendments of 1972 Plaintiff Doe 6)

509.    Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-420 of this Complaint with the same force and vigor as if set out here in full.

510.     Plaintiff Doe 6 reported a sexual assault by a Howard student, in violation of her right to an educational environment free from sex discrimination under Title IX.

511.     The harassment was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities or benefits provided by the school.

512.     Howard's response to reports of sexual assault amounts to an official policy of sex discrimination.

513.     Howard University had knowledge of Plaintiff Doe 6's complaint of sexual assault, the name of her rapist, and the details of the sexual violence.

514.     Howard University acted with deliberate indifference to Plaintiff Doe 6's complaint of sexual assault where it had knowledge that her assailant raped at least one other Howard student and allowed him to remain on campus, a direct threat to Doe 6 and other Howard students' safety on campus.

515.     Howard University acted with deliberate indifference to Plaintiff Doe 6's complaint of sexual assault where it failed to provide her with reasonable accommodations to the continued trauma of seeing her assailant on campus while her complaint was under investigation.

516.     Howard University acted with deliberate indifference to Plaintiff Doe 6's complaint of sexual assault where it failed to provide her with reasonable accommodations so that she could complete and succeed in her course work.

517.     Howard University acted with deliberate indifference to Plaintiff Doe 6's complaint of sexual assault where it violated its own policy and Title IX by failing to promptly investigate complaints of sexual assault.

518.    Howard was deliberately indifferent to Plaintiff Doe 6's report of sexual assault where it failed to notify Plaintiff Doe 6 that additional time was needed to complete an investigation into her report of sexual assault.

519.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 6 was denied or limited in her ability to participate in or benefit from the school's educational programs or activities on the basis of sex.

520.    As a direct and proximate result of Howard University's unlawful acts, Plaintiff Doe 6 suffered and continues to suffer lost earnings, employment and educational benefits, emotional pain, suffering, personal embarrassment, humiliation, and loss of enjoyment of life.

**PRAYER FOR RELIEF**

**WHEREFORE**, the premises considered, Plaintiffs respectfully pray that this Honorable Court:

1. Enter judgment in favor of Plaintiff Jane Doe 1 against Defendant Howard University;

2. Enter judgment in favor of Plaintiff Jane Doe 2 against Defendant Howard University;

3. Enter judgment in favor of Plaintiff Jane Doe 3 against Defendant Howard University;

4. Enter judgment in favor of Plaintiff Jane Doe 4 against Defendant Howard University;

5. Enter judgment in favor of Plaintiff Jane Doe 5 against Defendant Howard University;

6. Enter judgment in favor of Plaintiff Jane Doe 6 against Defendant Howard University;

7. Order permanent injunctive relief requiring Howard University to immediately revise and remedy its Title IX policies to eliminate the active hostile education environment experienced by Howard students who complain of sexual violence;

8. Award each Plaintiff compensatory damages and punitive damages;

9. Award each Plaintiff her court costs and expenses, including reasonable attorneys' fees;

84

10. Award each Plaintiff pre-judgment interest and post-judgment interest;

11. Declare Defendant's conduct in violation of Title IX of the Education Amendments of

1972, 20 U.S.C. § 1681; and

12. Grant such other relief as this Court deems just and proper.

Date: November 27, 2017                    Respectfully submitted,

                                           CORREIA & PUTH, PLLC


                                             /s/  Linda M. Correia
                                           Linda M. Correia (D.C. Bar No. 435027)
                                           Lauren A. Khouri (D.C Bar No. 10282288)
                                           1775 K Street NW, Suite 600
                                           Washington, DC 20006
                                           (202) 602-6500
                                           lcorreia@correiaputh.com
                                           lkhouri@correiaputh.com

                                           *Counsel for Plaintiffs*

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues contained herein.

/s/  Linda M. Correia
Linda M. Correia (D.C. Bar No. 435027)
Lauren A. Khouri (D.C Bar No. 10282288)
CORREIA & PUTH, PLLC
1775 K Street NW, Suite 600
Washington, DC 20006
(202) 602-6500
lcorreia@correiaputh.com
lkhouri@correiaputh.com

*Counsel for Plaintiffs*