**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **JANE DOE 1**, *et al.,* | ) |
|  | ) |
|  | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | )      Civil Action No. 17-cv-870 (TSC) |
|  | ) |
|  | ) |
| **HOWARD UNIVERISTY**, | ) |
|  | ) |
|  | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## <u>MEMORANDUM OPINION</u>

Plaintiffs are six women, all current or former Howard University students, who allege that Howard discriminated and retaliated against them in violation of Title IX of the Education Amendments of 1972 when they reported sexual assaults from members of the school community. Howard has moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, Howard's motion will be denied as to Counts I, II, III, IV, VI, VIII, and IX and granted as to Counts V and VII.

## I.    BACKGROUND

Howard University is a higher education institution that received federal financial assistance within the meaning of Title IX, 20 U.S.C. § 1681 *et seq.*, during all times relevant to this case. Amended Complaint ("Am. Compl.") ¶ 20, ECF No. 22. Plaintiffs, proceeding under pseudonyms Jane Does 1 through 6, reported to Howard's Title IX Coordinator and other members of the administration that they had been sexually assaulted by male students and a Howard employee in 2014, 2015, and 2016. Each Plaintiff alleges that Howard's responses to

their reports violate Title IX (Counts I, III, V, VI, VII, and IX), and Jane Does 1, 2, and 5 also claim Howard retaliated against them because they reported their sexual assaults (Counts II, IV, and VIII).

## II.     LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). When assessing the complaint, the court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)) (alterations in original) (citation omitted). The court also must accept the alleged facts as true and "construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quotation marks omitted). Although a plaintiff can survive a Rule 12(b)(6) motion if "recovery is very remote and unlikely," the complaint's factual assertions "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (quotation marks omitted).

## III.     ANALYSIS

Under Title IX, "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX prohibits "both sexual harassment and retaliation against a person because that person has complained of sexual harassment." *Wells v. Hense*, 235 F. Supp. 3d 1, 7 (D.D.C. 2017) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005)). Educational institutions that accept Title IX funds must

comply with its requirements. *Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1098 (10th Cir. 2019) ("Congress enacted Title IX under its spending power, 'conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds.'") (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998)).

Although Title IX's "only express enforcement mechanism . . . is an administrative procedure resulting in the withdrawal of federal funding from noncompliant institutions," *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 247 (2009), plaintiffs may enforce the statute's prohibitions on sex discrimination through an implied private right of action, *Gebser*, 524 U.S. at 281, and collect damages for "claims based on a funding recipient's 'deliberate indifference' to the sexual harassment of a student by another student, and for retaliation." *Wells*, 235 F. Supp. 3d at 7 (citations omitted); *see also Jackson*, 544 U.S. at 173 ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action.").

### A. Title IX "Deliberate Indifference" Discrimination

#### 1. Legal Standard

A school is liable under Title IX only "for its own misconduct," which can include "discrimination in the form of student-on-student sexual harassment." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639-40 (1999). In other words, a school is liable only when it "subjects its students to harassment." *Id.* at 644 (quotation marks and alteration omitted).

Plaintiffs alleging Title IX discrimination claims arising from student-on-student sexual harassment must show first that the school "exercise[d] substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645. Second, plaintiffs must have suffered harassment "that is so severe, pervasive, and objectively offensive that it can be

said to deprive [them] of access to the educational opportunities or benefits provided by the school." *Id.* at 650. Third, the school must have had "actual knowledge" of the harassment. *Id.* Fourth, the school must have acted with "deliberate indifference" to the harassment. *Id.* at 643. And fifth, a school's deliberate indifference must "cause[] students to undergo harassment or make[] them liable or vulnerable to it." *Id.* at 645.

With respect to the fourth element, the Supreme Court has stressed that the "deliberate indifference" standard is a "high" one, fashioned to provide schools "the flexibility they require" and to restrain courts "from second-guessing the disciplinary decisions made by school administrators." *Id.* at 643, 648. Victims of peer harassment do not have the right "to make particular remedial demands." *Id.* at 648. Therefore, "deliberate indifference" can be found "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. This standard considers "the level of disciplinary authority available to the school and . . . the potential liability arising from certain forms of disciplinary action." *Id.* at 649.

Determining whether "a plaintiff alleging student-on-student harassment has met these requirements is 'a fact[–]intensive inquiry that often must be resolved by the trier of fact.'" *Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9, 26 (D.D.C. 2018) (quoting *Karasek v. Regents of the Univ. of Cal.*, 2016 WL 4036104, at *11 (N.D. Cal. July 28, 2016)) (alteration in original). Nonetheless, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

Here, it is the meaning of the fifth element, requiring a school's deliberate indifference to cause a student to suffer harassment or make the student vulnerable to harassment, where most of the debate between the parties exists.

2. <u>Whether Plaintiffs Can State A Claim By Alleging That A School's Deliberate Indifference Made Them Vulnerable To Sexual Harassment</u>

Defendant argues that, to sustain a Title IX discrimination claim, a plaintiff must show that a school's deliberate indifference caused *subsequent* harassment. Conversely, Plaintiffs contend that a Title IX violation occurs when a school's deliberate indifference causes a student to suffer subsequent harassment *or* makes her liable or vulnerable to it. The D.C. Circuit has not weighed in on this issue, and there is a split among circuits and district courts.

Recently, the Tenth Circuit considered the certified question of "whether Plaintiff was required to allege, as a distinct element of her Title IX claim, that [the school's] deliberate indifference caused her to suffer actual further harassment, rather than alleging that Defendant's post-assault deliberate indifference made her 'liable or vulnerable to' harassment." *Farmer*, 918 F.3d at 1102 (citation omitted). The Tenth Circuit held that "Plaintiffs can state a viable Title IX claim for student-on-student harassment by alleging that the funding recipient's deliberate indifference caused them to be 'vulnerable to' further harassment without requiring an allegation of subsequent actual sexual harassment." *Id.* at 1104. The First and Eleventh Circuits have ruled similarly. *See Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172 (1st Cir. 2007) ("[T]he [*Davis*] Court stated that funding recipients may run afoul of Title IX not merely by 'caus[ing]' students to undergo harassment but also by 'mak[ing] them liable or vulnerable' to it.") (quoting *Davis*, 526 U.S. at 645) (alterations in original), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007) (finding that a school may be liable where the complaint showed that the plaintiff

withdrew from the school the day after the assault and therefore did not experience any further harassment).

In this district, one court has held that "Title IX does not require that a defendant[']s deliberate indifference lead to subsequent actionable harassment." *Wells*, 235 F. Supp. 3d at 8. Numerous judges in other districts have reached the same conclusion. *See, e.g., Doe v. Baylor Univ.*, 240 F. Supp. 3d 646, 660 (W.D. Tex. 2017) ("[T]he discriminatory harm can include the harm faced by student-victims who are rendered vulnerable to future harassment and either leave school or remain at school and endure an educational environment that constantly exposes them to a potential encounter with their harasser or assailant."); *Spencer v. Univ. of N.M. Bd. of Regents*, 2016 WL 10592223, at *6 (D.N.M. Jan. 11, 2016) ("In the context of Title IX, there is no 'one free rape' rule; and a victim does not have to be raped twice before the school is required to respond appropriately.") (citation and quotation marks omitted); *Karasek*, 2015 WL 8527338, at *12 ("[I]t is possible for a plaintiff to bring a Title IX claim against an educational institution even in the absence of any further affirmative acts of harassment by the alleged harasser or other students or faculty."); *Takla v. Regents of the Univ. of Cal.*, 2015 WL 6755190, at *6 (C.D. Cal. Nov. 2, 2015) ("The Court agrees with plaintiffs that placing undue emphasis on whether further harassment actually occurred to gauge the responsiveness of an educational institution would penalize a sexual harassment victim who takes steps to avoid the offending environment in which she may again encounter the harasser.").

The Eighth and Ninth Circuits appear to require a showing of subsequent harassment. In *K.T. v. Culver-Stockton College*, the Eighth Circuit found:

> [T]he complaint identified no causal nexus between [the school's] inaction and K.T.'s experiencing sexual harassment . . . . The complaint does not . . . allege that [the school's] purported indifference subject[ed] [K.T.] to harassment. Thus, while K.T. was dissatisfied with [the school's] response, based on the allegations in the complaint the

response cannot be characterized as deliberate indifference *that caused the assault*. We therefore agree with the district court that K.T. failed to adequately plead deliberate indifference.

865 F.3d, 1054, 1058 (8th Cir. 2017) (citation and quotation marks omitted) (emphasis in original). *See also Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000) ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis*, the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").[1]

Several district courts, including one in this district, have also found that subsequent harassment is required for an actionable Title IX claim. *See, e.g., Moore v. Murray State Univ.*, 2013 WL 960320, at *4-5 (W.D. Ky. Mar. 12, 2013) ("[T]he complaint contains no allegations that any further harassment occurred after the assault. . . . The critical piece missing from [the student's] complaint is any allegation that she was 'subjected' to or experienced sexual harassment *after* notifying [school personnel] about the [initial] assault.") (emphasis in original); *Blue v. District of Columbia*, 850 F. Supp. 2d 16, 35 (D.D.C. 2012) ("Finally but significantly, Plaintiff does not allege that further sexual harassment occurred as a result of [the school's] deliberate indifference.") (quotation marks omitted).

This court agrees with the Tenth Circuit's conclusion that *Davis* "clearly indicates that Plaintiffs can state a viable Title IX claim by alleging alternatively *either* that [a school's]

---

[1] In *Kollaritsch v. Michigan State University Board of Trustees*, the Sixth Circuit has accepted the following certified questions from the district court: "(1) must a plaintiff plead, as a distinct element of a Title IX claim, that she suffered acts of further discrimination as a result of the institution's deliberate indifference, rather than alleging mere vulnerability to further acts of discrimination; and (2) if a plaintiff must plead acts of further discrimination, does a plaintiff's allegations that the institution's deliberate indifference caused the deprivation of educational opportunities satisfy the pleading requirement?" 285 F. Supp. 3d 1028, 1033 (W.D. Mich. 2018), *interlocutory appeal docketed*, Nos. 17-2445, 18-1715 (6th Cir. June 25, 2018).

deliberate indifference to their reports of rape caused Plaintiffs 'to undergo' harassment *or* 'ma[d]e them liable or vulnerable' to it." *Farmer*, 918 F.3d at 1103 (emphasis and alteration in original) (quoting *Davis*, 526 U.S. at 645). Moreover, finding Title IX liability based on vulnerability to harassment is consistent with the statute's objectives, "which include protecting individual students against discriminatory practices." *Id.* at 1104 (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704).

> The alternative offered by the University—i.e., that a student must be harassed or assaulted a second time before the school's clearly unreasonable response to the initial incident becomes actionable, irrespective of the deficiency of the school's response, the impact on the student, and the other circumstances of the case—runs counter to the goals of Title IX and is not convincing.

*Karasek*, 2015 WL 8527338, at *12.

This holding is consistent with *Davis*'s admonition that schools are not required to "remedy peer harassment." 526 U.S. at 648 (quotation marks omitted). Title IX liability derives from the school's deliberate indifference to known student-on-student sexual harassment, which leaves victims vulnerable to additional harassment, not from a failure to remedy any past harassment. *Id.* Thus, a school's inadequate response creates a hostile environment that deprives victims of the school's educational opportunities and benefits. *Id.* at 650. "The statute makes clear that, whatever else it prohibits, students must not be denied access to educational benefits and opportunities on the basis of gender." *Id.*

### 3. Deliberate Indifference And Vulnerability To Harm

Howard does not dispute that all six Plaintiffs sufficiently allege facts demonstrating the first, second, and third elements of a claim under *Davis*: 1) that Howard exercised substantial control over both the harasser and the context in which the harassment occurred; 2) that the harassment was so severe, pervasive, and objectively offensive that it plausibly deprived

Plaintiffs of access to educational opportunities or benefits provided by the school;[2] and 3) that Howard actually knew of the harassment. Instead, Howard argues that Plaintiffs did not plead that Howard was deliberately indifferent to their reports of sexual assault or that Howard's actions *caused* them to suffer subsequent harassment after Howard received the initial reports. Because the court disagrees with Howard's legal contention regarding the future harm requirement, the remaining issues for the court to decide are 1) whether Plaintiffs adequately pleaded that Howard was deliberately indifferent, and, if so, 2) whether that deliberate indifference made Plaintiffs vulnerable to future harassment.

Howard's responses to the reports of sexual harassment were "deliberately indifferent" if "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. At the motion to dismiss stage, "the Court need not, and should not, separately assess each of the alleged actions or failures to act identified in [Plaintiffs'] complaint to determine whether each discrete episode might, standing alone, support a claim of deliberate indifference to student-on-student harassment." *Cavalier* 306 F. Supp. 3d at 27; *see also Takla*, 2015 WL 6755190, at *6 ("The [complaint] contains a number of allegations that, taken together, makes a plausible claim that [the school's] response to [the student's] report of sexual harassment was deficient and not reasonably expected to remedy the violation" even though "taken individually, may not constitute deliberate indifference."). At this stage of the litigation, the court's responsibility "is limited to deciding whether the complaint contains any factual allegations sufficient to support 'the reasonable inference that the [University] is liable for the misconduct alleged.'" *Cavalier*, 306 F. Supp. 3d at 27 (quoting *Iqbal*, 556 U.S. at 678).

---

[2] A single, serious sexual assault can meet the severe, pervasive, and offensive standard. *See, e.g.*, *T.Z. v. City of N.Y.*, 634 F. Supp. 2d 263, 270-71 (E.D.N.Y. 2009).

i. *Jane Doe 1*

Jane Doe 1 alleges that on February 7, 2016 she was raped in her dormitory by another Howard student, "Assailant 1." Am. Compl. ¶ 51. Both she and Assailant 1 were dormitory Resident Assistants ("RAs"). *Id.* ¶¶ 49, 51. On February 28, 2016, Jane Doe 1 reported the rape to Howard's Title IX Coordinator Candi Smiley and campus police. *Id.* ¶ 53. Jane Doe 1 told Smiley that she and Assailant 1 lived in the same dormitory, served as RAs together, and were in two classes together. *Id.* ¶ 54. Jane Doe 1 also reported that she did not feel safe seeing Assailant 1 in her living space and classes. *Id.* Although Jane Doe 1 provided "specific detail" about the rape, *id.*, Smiley's written account of Jane Doe 1's rape stated only, "My name is [Jane Doe 1]. On February 7, 2016, [Assailant 1] raped me in my dorm room." *Id.* ¶ 56.

In response to Jane Doe 1's report, Howard transferred Assailant 1 to another dormitory, but said it could not remove him from Jane Doe 1's classes. *Id.* ¶¶ 57-58. While the rape investigation was pending, Jane Doe 1 sought to take the classes she shared with Assailant 1 remotely. *Id.* ¶ 58.

Around March 1, 2016, Smiley contacted Jane Doe 1 and asked if she had been discussing her rape in a group text message chain. *Id.* ¶ 59. Jane Doe 1 said she had not and asked who made this allegation to Smiley. *Id.* Smiley did not respond. *Id.* Jane Doe 1 claims that Smiley's inquiry made her feel "unsafe and targeted as a result of her report of sexual assault." *Id.* Between March 1 and March 21, 2016, Jane Doe 1 called Smiley four times, but Smiley did not return her calls or communicate with her. *Id.* ¶¶ 61-62.

On March 8, 2016, based on a report from Assailant 1, Howard fired Jane Doe 1 from her RA position. *Id.* ¶ 63. Jane Doe 1 then posted a "tweet" on Twitter expressing her frustration with Howard's handling of her sexual assault report.[3] *Id.* ¶ 65.

Numerous Howard students responded to Jane Doe 1's tweet and expressed their own frustrations with the school's responses to their reports of sexual assault or harassment. *Id.* ¶ 66. One of these students was Jane Doe 2, who on March 21, 2016 told Jane Doe 1 that she also had been raped by Assailant 1 and had reported the assault to Howard in October 2015. *Id.* ¶¶ 67-68.

On March 22, 2016, Howard issued a press release stating: "There has been an allegation of sexual assault committed by a Howard University student against another Howard student. The University administration is aware of the allegation and took immediate action as soon as we learned of this matter." *Id.* ¶ 71.

After Jane Doe 1's twitter post, she met with Dean Heath, a Howard administrator, who, referring to her tweet criticizing Howard's response to her complaint, stated, "you embarrassed your family by doing that." *Id.* ¶ 73. This statement made Jane Doe 1 stressed and anxious about her parent's reaction and fearful that she would lose her family support. *Id.* ¶ 73.

Jane Doe 1 alleges that Howard's response to her rape report caused her to become increasingly depressed and in constant fear of encountering her rapist on campus, and her grades suffered. *Id.* ¶ 86. Moreover, Howard allowed Assailant 1 to continue to serve as an RA, giving him broad access to dorms and facilities, which made Jane Doe 1 particularly anxious. *Id.* ¶ 87.

---

[3] The date of this "tweet" is not clear in the Amended Complaint.

On March 31, 2016, Jane Doe 1 was told by a reporter that Assailant 1 had been expelled for misconduct unrelated to the assaults.[4] *Id.* ¶ 88. Jane Doe 1 did not hear from Howard about her complaint or Assailant 1's removal from school. *Id.* On April 5, 2016, Jane Doe 1 saw video footage of Assailant 1 walking into her dormitory building through a door that required an ID card to open.[5] *Id.* ¶ 89.

In April 2016, Smiley finalized the investigation into Jane Doe 2's sexual assault report, found that Assailant 1 engaged in non-consensual sexual contact with Jane Doe 2, and suspended him from campus for two years. *Id.* ¶ 75. Had Howard complied with its own policy, it would have completed the investigation into Jane Doe 2's report by December 21, 2015. *Id.* ¶ 81. Howard did not inform Jane Doe 1 that Assailant 1 had been removed from campus. *Id* ¶ 75. At the time she filed her Amended Complaint, Jane Doe 1 still had not received an investigatory report or any other information about the resolution of her claim. *Id.* ¶¶ 77, 80.

These facts are enough for the court to find it plausible that Howard's response was clearly unreasonable in light of the known circumstances. The unreasonableness of Howard's delay in investigating Jane Doe 1's complaint is exacerbated by the fact that Howard knew about an earlier allegation that the same assailant had sexually assaulted another student—an allegation that the school did not promptly investigate. The comments made by Howard personnel to Jane Doe 1 also demonstrate a reluctant and hostile response. Additionally, Jane Doe 1 has alleged sufficient facts for the court to find it plausible that Howard's deliberate indifference caused her

---

[4] It is not clear from the Amended Complaint whether the information that Jane Doe 1 received from the reporter in March 2016 was correct.

[5] While the Amended Complaint does not state that Assailant 1 used *his* ID card to gain access to the building, the court, as it must at this stage of the case, will construe the complaint in favor of Jane Doe 1 and find that Assailant 1 was able to gain access using his ID card.

to be vulnerable to future harassment, because she felt depressed and constantly fearful of encountering her rapist on campus, and her grades suffered.

ii. *Jane Doe 2*

Jane Doe 2 alleges that on May 1, 2015, Assailant 1 raped her in a parking garage on Howard's campus. *Id.* ¶ 114. Because Jane Doe 2 believed that Assailant 1 was a senior and would be graduating that month, she did not immediately report the rape. *Id.* ¶ 115. When she returned to campus in the fall of 2015, Jane Doe 2 discovered not only that Assailant 1 was still a student at Howard, but that he was also an RA in her dormitory. *Id.* ¶ 116. Assailant 1 continued to harass Jane Doe 2. *Id.* On October 17, 2015, Jane Doe 2 reported the May 2015 rape to the D.C. Metropolitan Police Department ("MPD"), which then contacted Howard. *Id.* ¶ 117.

A few days later, on October 22, Jane Doe 2 also reported the assault and subsequent harassment to Smiley. *Id.* ¶ 118. On October 27, Jane Doe 2 asked if Assailant 1 could be moved to another dorm, but Smiley told her that could not happen until the investigation was complete. *Id.* ¶ 119. Jane Doe 2 felt unsafe living in the same dorm as Assailant 1 and knew that, as an RA, he had access to a key to her room, so she moved to a different dormitory and was told she would not be charged for the room change. *Id.* ¶¶ 120-21. On October 29, 2015, Jane Doe 2 sent Smiley a detailed report of the assault with text messages from Assailant 1 showing "contemporaneous documentation of the rape." *Id.* ¶ 122.

For the next month and a half, Jane Doe 2 heard nothing from Smiley or any other Howard administrator about her report, causing her to feel depressed, anxious and betrayed by the school. *Id.* ¶¶ 123-24. In mid-December, Smiley asked Jane Doe 2 to resend the text messages she had sent in October. *Id.* ¶ 125. After resending the text messages, Jane Doe 2 did not hear from Smiley again in December. *Id.*

At the end of the semester, Jane Doe 2's grades were suffering, and she was in danger of losing her scholarship because she was afraid to leave her dorm room and encounter Assailant 1. *Id.* ¶ 126. Consequently, she left Howard at the end of the semester. *Id.* During her efforts to withdraw from the school, she encountered numerous problems from the Howard administration with regards to her transcript and officially withdrawing from the school. *Id.* ¶¶ 126-31. She was also charged and paid the cost of switching dorm rooms. *Id.* ¶¶ 127-28.

Jane Doe 2 did not hear from Smiley or anyone else at Howard regarding her assault until March 24, 2016, after Jane Doe 1 posted her complaints on Twitter. *Id.* ¶ 132. Jane Doe 2 asked about the status of the investigation, and Smiley said she was waiting for Jane Doe 2 to send her the corroborating text messages—the same messages Jane Doe 2 had sent twice before. *Id.* ¶ 133. Jane Doe 2 sent the text messages to Smiley a third time. *Id.*

Howard's actions, or lack thereof, made Jane Doe 2 feel that she could not return to Howard's campus. *Id.* ¶ 134. In April 2016, she learned that the school had found that Assailant 1 had engaged in non-consensual sexual contact with her and had suspended him from campus for two years. *Id.* ¶¶ 135-36.

These facts permit the inference that Howard did virtually nothing to investigate Jane Doe 2's complaint for roughly five months, and that only Jane Doe 1's Twitter activity caused Howard to adequately investigate Jane Doe 2's complaint and take action within a month. The fact that Smiley asked—and only when prompted by Jane Doe 2's inquiry—for the corroborating text messages that Jane Doe 2 had sent twice before indicates that Howard had done minimal investigation into Jane Doe 2's allegation. Finally, by refusing to move an alleged assailant out of Jane Doe 2's dormitory and then charging Jane Doe 2 a fee for transferring dorms, after telling her that she would not be charged, Howard showed a callous and indifferent response.

Therefore, the court finds it plausible that Howard's response to Jane Doe 2's report was deliberately indifferent.

Moreover, because Jane Doe 2's grades fell after she stopped leaving her room for fear of encountering Assailant 1, and she eventually left Howard because she did not feel safe there, a further plausible finding is that Howard's deliberate indifference caused Jane Doe 2 to be vulnerable to further harassment.

### iii.    *Jane Doe 3*

Jane Doe 3 was a Howard student in the Reserve Officers' Training Corps ("ROTC"), and was on a full scholarship as part of that program.  *Id.* ¶ 142.  While at Howard, Jane Doe 3 was in a relationship with a Howard University campus police officer, "Assailant 2," who sexually and physically abused her.  *Id.* ¶¶ 144-47.  Jane Doe 3 reported the abuse to a confidant in November 2014, who then reported the abuse to Howard's campus police.  *Id.* ¶ 147.  An investigator from Howard's campus police took Jane Doe 3 to an MPD precinct where she reported the abuse.  *Id.* ¶ 148.  Smiley was present at this meeting, along with an administrator from Howard's Interpersonal Violence Prevention Center.  *Id.* ¶ 149.

After the meeting, Smiley told Jane Doe 3 to let her and the administrator know if she needed academic accommodations or counseling.  *Id.* ¶ 150.  From January to mid-February 2015, Jane Doe 3 tried to obtain counseling services at Howard's counseling center, but was unable to get any assistance, even though she told Howard personnel that she was suicidal and had difficulty getting out of bed in the morning.  *Id.* ¶¶ 152-62.  Although she was finally offered counseling services, the times offered conflicted with her work schedule and she was not provided with any counseling alternatives.  *Id.* ¶¶ 162-65.

Jane Doe 3's depression and anxiety affected her grades and her ability to attend class. *Id.* ¶ 170.  She requested academic accommodations, but they were denied in two of her classes.

*Id.* ¶¶ 171-79. She subsequently failed those two classes and risked losing her ROTC scholarship. *Id.* ¶ 179. Over the course of the next year, Jane Doe 3 and an advocate unsuccessfully lobbied Howard to allow her to make up work in those classes to raise her grades. *Id.* ¶¶ 180-213. At the time the Amended Complaint was filed, two and a half years after she reported the sexual and physical abuse, Jane Doe 3 still did not know the status of the investigation, although she was later told by campus police that her assailant was terminated from his position. *Id.* ¶ 215-16.

Despite these alleged facts, the court is unable to conclude the Jane Doe 3 has stated a sufficient claim for Title IX discrimination. Even if the court were to find that it is plausible that Howard's actions constitute deliberate indifference, the court cannot find on the facts alleged that the deliberate indifference caused Jane Doe 3 to be vulnerable to future harassment. While Jane Doe 3 eventually learned of her assailant's termination, she does not state *when* she learned this information. Because the court has no way of knowing whether she learned this information a day or a year after making her report, the court is unable to find that it is plausible that Jane Doe 3 either was subjected or vulnerable to further harassment.

Therefore, Defendant's motion to dismiss Jane Doe 3's Title IX discrimination claim (Count V) will be granted. However, the court will grant her leave to amend the complaint to include facts showing that Howard's alleged deliberate indifference caused her to be subjected or vulnerable to further harassment by Assailant 2.

iv.     *Jane Doe 4*

On March 9, 2016, Jane Doe 4 was raped by "Assailant 3" on Howard's campus. *Id.* ¶ 226. The next day, Jane Doe 4 reported the rape to Smiley. *Id.* ¶ 228. Jane Doe 4 asked that she be allowed to change dormitories as quickly as possible because she and Assailant 3 lived in

adjacent dormitories. *Id.* ¶¶ 229-30. Smiley told Jane Doe 4 that she could transfer dormitories and that Smiley would be in touch regarding logistics and next steps. *Id.* ¶ 229. Smiley also said she would forward Jane Doe 4's information to the Dean for Special Student Services, Dr. Heath. *Id.*

On March 14, 2016 Jane Doe 4 contacted Smiley about her request to switch dormitories. *Id.* ¶ 234. Although Smiley said she had shared her information with Dr. Heath, Jane Doe 4 had not heard from Dr. Health, so she called Dr. Heath the next day. *Id.* On March 17, 2016 Jane Doe 4 spoke with Dr. Heath, and she moved dormitories the next day. *Id.* ¶ 235.

After her assault, Jane Doe 4 frequently saw Assailant 3 on campus. *Id.* ¶ 247. On April 1, 2016, she told Smiley that she continued to see her assailant and felt increasingly unsafe on campus. *Id.* ¶ 248. Jane Doe 4 asked to have her and Assailant 3's schedules coordinated so she did not have to fear encountering him on campus. *Id.* Howard did not grant this request. *Id.* ¶ 278. Howard learned on April 7, 2016 that Jane Doe 4 and Assailant 3 were continuing to cross paths and Assailant 3 was apparently unaware of or not abiding by a stay away order. *Id.* ¶ 253. Even though Howard was informed numerous times that seeing her assailant was disrupting Jane Doe 4's education, Howard assigned them to the same dormitory the semester after Jane Doe 4's rape report. *Id.* ¶¶ 247-48, 253, 255, 261, 267, 270-72, 275, 280. This dorm assignment problem was resolved only after Jane Doe 4 and her advocate lobbied Howard to correct it. *Id.* ¶¶ 280-88.

It was not until August 23, 2016, five and a half months after her report, that Jane Doe 4 learned that Howard had made a finding of sexual violence against Assailant 3, who was suspended for one semester. *Id.* ¶ 290. During that semester suspension, Jane Doe 4 saw Assailant 3 on campus at a homecoming event. *Id.* ¶ 291. She told a campus police officer, who

responded that because the Howard Title IX office does not report its findings to campus police, Assailant 3 was not on the list of individuals banned from campus. *Id.* Jane Doe 4 showed campus police proof of Assailant 3's suspension, and he was removed from campus. *Id.* ¶ 292.

The court finds that Jane Doe 4 has pleaded sufficient facts to clear the motion to dismiss hurdle. A plausible finding is that the investigation took an unreasonable amount of time, especially considering that Howard had been told that Jane Doe 4's education was being adversely affected by her assailant's continuing presence on campus. Moreover, a plausible deliberate indifference finding is bolstered by the facts that Howard took a week to move Jane Doe 4 after her report, that Howard assigned Jane Doe 4 and Assailant 3 to the same dorm the next semester, and that campus police were not notified that Assailant 3 was not allowed on campus. Finally, it is plausible to find that this deliberate indifference caused Jane Doe 4 to be vulnerable to further harassment because her assailant remained on campus and she frequently saw him, which adversely affected her education.

v.  *Jane Doe 5*

Jane Doe 5 alleges that she was raped by Assailant 4 at a Howard party on April 25, 2015. *Id.* ¶ 304. The next day, she reported the rape to MPD, and on April 29, 2015 she reported the rape to Smiley and met with Howard Provost Dr. Terracita Powell. *Id.* ¶¶ 305, 307, 310. She told Powell that she no longer felt safe on Howard's campus, left Howard, and returned home to Michigan. *Id.* ¶¶ 310, 312. The same day Jane Doe 5 reported her rape, Howard told her she could not graduate that semester, and she requested accommodations from Howard to allow her to make up credits at a school in Michigan. *Id.* ¶¶ 308, 310.

On July 1, 2015, Jane Doe 5 sent Smiley her final statement of claims about the rape and asked for an update on the investigation. *Id.* ¶ 323. Smiley responded that she had been unable

to contact Assailant 4 and had not done much else on the investigation. *Id.* ¶ 324. That summer, Jane Doe 5 completed the full number of credit hours at the school in Michigan that she needed to graduate from Howard. *Id.* ¶ 327.

On December 9, 2015, Jane Doe 5 learned from Smiley that Howard had made a finding that Assailant 4 committed acts of sexual violence and had suspended him for two years. *Id.* ¶¶ 337-38. Nonetheless, Assailant 4 was permitted to continue taking classes at Howard for the remainder of the semester. *Id.* ¶ 339.

It was not until April 25, 2016 that Jane Doe 5 finally learned that the classes she took over the summer in Michigan had been accepted by Howard and she would be eligible to graduate. *Id.* ¶¶ 308-49. Until then, it was possible that Jane Doe 5 would have had to return to Howard in order to graduate. *Id.* ¶ 341.

These facts state a plausible claim of deliberate indifference. Smiley admitted that for over two months, Howard did virtually nothing in response to Jane Doe 5's report of rape. While Jane Doe 5 did not provide the final statement of the incident until July 1, 2015, a fair inference, at this stage of the litigation, is that Howard could have at least begun its investigation without it. Moreover, Howard took over seven months to conclude the investigation. This finding is bolstered by the fact that Howard allowed Assailant 4 to continue to attend classes on campus after it had suspended him for violent sexual assault. It is plausible that this conduct was clearly unreasonable, and the fact that that Jane Doe 5 had returned to Michigan soon after her report does not change this finding. As the Eleventh Circuit found in a similar case,

> [a]lthough [the victim-student] withdrew from [the university] the day after the January 14 incident, we do not believe that at this stage her withdrawal should foreclose her argument that [the university] continued to subject her to discrimination. In light of the harrowing ordeal that [the victim-student] faced on January 14, her decision to withdraw from [the university] was reasonable and expected. Viewing the evidence in the light most favorable to [the victim-student], [the university] failed to take any precautions that

would prevent future attacks . . . .

*Williams*, 477 F.3d at 1297.

However, the fact that Assailant 4 remained on campus during the investigation does not establish that Jane Doe 5 was vulnerable to further harassment. Jane Doe 5 alleges that she "feared return[ing] to Howard's campus, a possibility that remained open when the school continued to delay confirming her ability to graduate." Am. Compl. ¶ 341. However, she never claims that, had Assailant 4 been removed from campus, she would have returned to Howard while its decision about her credits was pending, or that she told Howard she might return. These facts are critical to determining whether Howard's deliberate indifference caused her to be vulnerable to further harassment.

Therefore, Jane Doe 5's discrimination claim (Claim VII) will be dismissed with leave to amend to include facts showing that Howard's deliberate indifference caused her to endure or be vulnerable to additional harassment.

### vi. *Jane Doe 6*

Jane Doe 6 alleges that on April 9, 2016, she was raped by Assailant 5 on the Howard University campus. *Id.* ¶ 352. On April 15, 2016, Jane Doe 6 left campus and went to her parents' home. *Id.* ¶ 354. At some point between April 15, 2016 and April 18, 2016—it is not clear from the Amended Complaint—Jane Doe 6 reported the rape to Howard's emergency hotline. *Id.* ¶ 355. She returned to campus on April 18, 2016, and the next day met with Smiley and reported the rape. *Id.* ¶¶ 356, 359.

On April 21, 2016, Jane Doe 6 met with Smiley again and provided contact information for two witnesses. *Id.* ¶ 361. At this meeting, Smiley told Jane Doe 6 that investigations usually take three months and hers would be put on "pause" because of the impending summer break. *Id.* ¶¶ 361, 365.

Because Assailant 5 was a member of Howard's marching band, he spent June, July, and August of 2016 on campus. *Id.* ¶ 366.

Jane Doe 6 told Howard officials multiple times that she did not want to live in the same dorm as Assailant 5. *Id.* ¶¶ 365, 368. In mid-August, she learned that Assailant 5 was living in the same dorm to which she had been assigned, and, when Assailant 5 was moved to a different dorm, Howard did not inform Jane Doe 6 of the move until September 7, 2016. *Id.* ¶¶ 369-70. She was also told that Assailant 5 was banned from entering her dorm, but despite the ban, Jane Doe 6 saw him in her dorm. *Id.* ¶ 371.

On September 9, 2016, Smiley informed Jane Doe 6 that the investigation was "in full swing now." *Id.* ¶ 372. During that time, Jane Doe 6 saw Assailant 5 at least once a week. *Id.* ¶ 373. She contacted Smiley in late October to inquire about the status of the investigation and was told that it was ongoing and that Howard university employee "Winder" had taken over the investigation. *Id.* ¶ 374. Although both Jane Doe 6 and her mother attempted to contact Winder in fall 2016, neither of them heard back from him. *Id.* ¶¶ 376-77, 380. Between late October 2016 and February 2017, Jane Doe 6's mother called Winder eight times, with no response. *Id.* ¶ 385.

Finally, at the end of February, Jane Doe 6 spoke to Winder and told him that she continued to see Assailant 5 on campus and it was causing her anxiety. *Id.* ¶ 387. Winder told Jane Doe 6 that he had just looked up Assailant 5's name in "the system" and he was no longer on campus. *Id.* ¶ 388. Winder would not tell Jane Doe 6 why Assailant 5 was no longer on campus or when he left. *Id.*

Despite Winder's representation, Jane Doe 6 continued to see Assailant 5 on campus and heard from other students that he was still attending classes and practicing with the Howard

marching band. *Id.* ¶ 389. Jane Doe 6 also saw Assailant 5 swipe a student ID card to enter the cafeteria. *Id.*

On April 20, 2017 Jane Doe 6 learned from the Residence Director that Assailant 5 was being banned from her dorm. *Id.* ¶ 391. When Jane Doe 6 stated she thought he had been banned since September 2016, the Residence Director said her understanding was incorrect and the ban had just begun. *Id.*

The next day, Jane Doe 6 learned from a Howard administrator that Assailant 5 had raped another student and Howard was "reopening" Jane Doe 6's case. *Id.* ¶¶ 392-93. In July 2017, Jane Doe 6 also learned that Howard had already been aware of several other sexual assault complaints against Assailant 5 as of August 2016. *Id.* ¶ 395.

When Jane Doe 6 returned to campus for the fall semester in late August 2017, she saw Assailant 5 leaving a classroom. *Id.* ¶ 398. She immediately e-mailed Howard administrators and told them that she had seen Assailant 5 on campus and that it made her physically ill and made her feel unsafe on campus. *Id.* ¶ 399. Jane Doe 6 received no response for a month. *Id.* ¶ 401. She sent a follow-up e-mail telling the administrators that she continued to fear running into Assailant 5 on campus. *Id.* ¶ 402. Howard responded and told Jane Doe 6 that Assailant 5 was suspended from Howard University for Fall 2016 and Spring 2017 because of her Title IX complaint. *Id.* ¶ 403. Jane Doe 6 told school administrators that this explanation was unconvincing because she had been told that her investigation was ongoing during Fall 2016. *Id.* ¶ 404. Despite Howard's contention that the case had been closed in Fall 2016, no notice was given to Jane Doe 6. *Id.* ¶¶ 405-06.

Thus, Jane Doe 6 did not learn that the case was closed in Fall 2016 until more than a year later, in September 2017, despite asking for updates in October 2016, January 2017 and

February 2017. *Id.* ¶¶ 374, 380-88. At the time the Amended Complaint was filed—in November 2017—Jane Doe 6 continued to see Assailant 5 on campus at least once a week. *Id.* ¶ 409. In October 2017, she saw Assailant 5 on campus, and he and his friends followed her and stared at her. *Id.* ¶ 410. As a result of seeing Assailant 5 on campus, Jane Doe 6 became physically ill and missed classes and extracurricular activities. *Id.* ¶ 411.

These facts, as alleged, are legally sufficient for Jane Doe 6's claim to survive a motion to dismiss. It is plausible that Howard's actions were deliberately indifferent and caused Jane Doe 6 to be vulnerable to additional harassment. It took over 500 days for Jane Doe 6 to learn about the outcome of the investigation of her rape. The damage from this slow response was exacerbated because both Jane Doe 6 and Howard knew that Assailant 5 was accused of committing other acts of sexual violence. Finally, this deliberate indifference adversely affected Jane Doe 6's education.

### B. Title IX Retaliation

#### 1. Legal Standard

When a school receiving Title IX funds "retaliates against a person *because* he complains of sex discrimination, [that] constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Jackson*, 544 U.S. at 174 (emphasis in original). Beyond this direction, however, "neither the Supreme Court nor the D.C. Circuit has outlined the precise contours of a Title IX retaliation claim." *Cavalier*, 306 F. Supp. 3d at 36. Nonetheless, numerous courts have held that Title VII's retaliation standard controls in the Title IX context. *Id.* "Under that standard, a plaintiff must 'establish three elements: that she made a charge or opposed a practice made unlawful by Title [IX], that the [university] took a materially adverse action against her, and that the [university] took the action because of her protected conduct.'" *Id.* (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)) (alterations in original).

A student's report of sexual harassment or assault to school administrators constitutes protected activity protected under Title IX. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867-68 (9th Cir. 2014); *Dibbern v. Univ. of Michigan*, 2013 WL 6068808, at *9 (E.D. Mich. Nov. 18, 2013). An action is "materially adverse" if it "might have dissuaded a reasonable [student] from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation and quotation marks omitted). "In making that determination, moreover, '[c]ontext matters,' and thus the Court must assess the 'significance' of the action in light of 'the particular circumstances.'" *Cavalier*, 306 F. Supp. 3d at 36 (quoting *Burlington N.*, 548 U.S. at 69). A plaintiff need only clear a low hurdle to allege a causal link at the motion to dismiss stage. *See id.* at 38; *see also Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) ("The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative . . . action are not completely unrelated.") (quotation marks omitted). Close "temporal proximity" between the report of sexual abuse and the materially adverse action may be enough to show a causal connection. *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012); *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003).

Howard does not contest that Jane Does 1, 2 and 5 engaged in protected activity. Nor does it dispute that they suffered materially adverse actions, although it argues that they may not rely on the same conduct to constitute both deliberate indifference and retaliation claims. Howard's main argument is that Jane Does 1, 2 and 5 cannot show a causal connection between their protected activity and any materially adverse actions that Howard took.

2. <u>Jane Doe 1</u>

Jane Doe 1 alleges numerous adverse actions, but her primary one is that Howard fired her from her position as an RA roughly a week after she reported the rape to Smiley, allegedly because Assailant 1 had filed a report against her. Am. Compl. ¶¶ 53, 63. A male friend of Jane Doe 1's was also fired as an RA because of Assailant 1's accusation. *Id.* ¶ 104. Losing her job as an RA had negative financial repercussions for Jane Doe 1. *Id.* ¶ 90. Only after persistent outreach and advocacy over five months did she regain her employment as an RA on August 12, 2016. *Id.* ¶¶ 91-109. The male friend who was terminated with Jane Doe 1 regained his employment by August 1, 2016. *Id.* ¶ 104.

The close temporal relationship between Jane Doe 1's report on February 28, 2016, and her firing on March 8, 2016, is sufficient to show a causal connection. *Id.* ¶¶ 53, 63. Moreover, the Complaint suggests that the male student who was fired at the same time as Jane Doe 1 regained his employment faster, even though they were similarly situated. This apparent disparate treatment strengthens the causal connection. *See Mitchell v. Per-Se Techs., Inc.*, 64 F. App'x 926, 927 (6th Cir. 2003) ("Causation may be inferred from such factors as temporal proximity and differential treatment of similarly situated comparators."). In addition, the Dean's disparaging comment to Jane Doe 1 that she "embarrassed [her] family" with her "tweet," *id.* ¶ 73, also supports the causal element by showing Howard's hostility towards her. Although the Dean did not make this comment until after Jane Doe 1 was fired, the court must view the facts in the light most favorable to the Plaintiff and can draw a fair inference that the school harbored antagonistic feelings towards Jane Doe 1 because of her allegations before it fired her.

Howard contends that Jane Doe 1 was fired as an RA because she violated a school rule. *See, e.g.*, Defendant's Motion to Dismiss ("Mot. to Dismiss") at 40, ECF No. 23-2 ("Doe 1 was

25

not entitled to a free pass for violating those policies just because the report came from her alleged assailant, and the University was not prohibited from enforcing its conduct policies with regard to Doe 1 simply because she had previously filed a Title IX Complaint.").  However, this assertion is unsupported by any citation to the Complaint, which is silent on this point.  While it may be that during discovery, evidence supporting this claim will emerge, at this stage of the litigation Howard cannot introduce evidence outside of the Complaint as to why it fired Jane Doe 1 as an RA.  Moreover, in a motion to dismiss, a plaintiff "is not required . . . in order to state a claim of retaliation, to allege facts sufficient to negate the [defendant's] alternative explanations for its actions—whatever they may turn out to be." *Rochon v. Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006).

Therefore, Jane Doe 1's Title IX retaliation claim is sufficient to withstand a motion to dismiss.

### 3.  Jane Doe 2

Jane Doe 2 contends that, in addition to failing to investigate, Howard took other materially adverse actions against her after she reported the assault and decided to leave the school.  Jane Doe 2 reported her assault to the MPD on October 17, 2015, which then reported it to Howard that same day.  Am. Compl. ¶ 117.  On October 22, 2015, Jane Doe 2 reported the assault (and the subsequent harassment) by Assailant 1 to Smiley.  *Id.* ¶ 118.  Because Howard refused to move Assailant 1 to another dorm, Jane Doe 2 moved, and, despite Howard's assurances that she would not be charged, she eventually was charged and paid a fee for the transfer.  *Id.* ¶¶ 119, 121, 128.

After reporting the sexual assault, Jane Doe 2 heard nothing from Smiley or any other Howard administrator regarding her report, and by the end of the 2015 fall semester she left Howard University.  *Id.* ¶¶ 123, 126.  While seeking to enroll at a new school, she saw that not

only had Howard charged her for moving dormitories, but it had erroneously removed Pell grant

and need-based scholarships from her transcript, making it appear that she owed Howard a

significant amount of money. *Id.* ¶ 127. Because of this apparent debt, Howard refused to

release her transcript, which Jane Doe 2 needed for her school transfer applications. *Id.*

Complications from these errors continued through February 2017, more than a year after she

had left Howard. *Id.* ¶¶ 127-31.

The close temporal relationship between Jane Doe 2's report to Smiley and the erroneous

charges on her account is enough for her retaliation claim to survive at the motion to dismiss

stage. "To survive a motion to dismiss a retaliation claim, 'all the complaint has to say' is 'the

[defendant] retaliated against me because I engaged in protected activity.'" *Macon v. U.S.

Capitol Police Bd.*, 258 F. Supp. 3d 94, 106 (D.D.C. 2017) (quoting *Rochon*, 438 F.3d at 1220)

(original alteration omitted).

The court is unconvinced by Howard's argument that Jane Doe 2 must allege that the

administrators at Howard responsible for the financial charges knew about her reported sexual

assault. *See* Mot. to Dismiss at 41. The Second Circuit has rejected this argument.

> Even if the agents who carried out the adverse action did not know about the plaintiff's
> protected activity, the 'knowledge' requirement is met if the legal entity was on notice.
> Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement,
> anything more is necessary than general corporate knowledge that the plaintiff has
> engaged in a protected activity.

*Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) (quotation

marks and citations omitted); *but see Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197

(11th Cir. 1997) ("Since corporate defendants act only through authorized agents, in a case

involving a corporate defendant the plaintiff must show that the corporate agent who took the

adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action.").

### 4. Jane Doe 5

On April 29, 2015, Jane Doe 5 reported her rape to Smiley. Am. Compl. ¶ 307. That same day Howard told her she could not graduate that semester. *Id.* ¶ 308. That day, Jane Doe 5 also requested accommodations from Howard to allow her to make up credits at a school closer to her home in Michigan because she no longer felt safe on campus. *Id.* ¶ 310. It was not until April 25, 2016—after an arduous, year-long process—that Jane Doe 5 learned that the classes she took at this other school had been accepted by Howard and she would be eligible to graduate. *Id.* ¶¶ 308-49. These facts are enough for Jane Doe 5 to make out her claim that Howard retaliated against her by failing to provide her with reasonable accommodations to complete and succeed in her course work.

### 5. Failure To Adequately Investigate For Jane Does 2 And 5

Finally, Jane Does 2 and 5 allege that Howard's inadequate responses to their sexual assault reports also constitute retaliation—i.e., that the conduct that forms their deliberate indifference claims can also be the basis for their retaliation claims. While courts appear to be divided on the question of whether the same conduct can constitute deliberate indifference and retaliation under Title IX, *compare Wells*, 235 F. Supp. 3d at 10 n.4 *with E.N. v. Susquehanna Twp. Sch. Dist.*, 2010 WL 4853700, at *17 (M.D. Pa. Nov. 23, 2010), this court need not reach that question because it has found, as stated above, that Jane Does 2 and 5 have pleaded adverse actions apart from the deliberately indifferent harmful inaction. Jane Doe 2 pleaded that Howard subjected her to punitive financial harm, while Jane Doe 5 pleaded that Howard delayed clearing her to graduate. Moreover, the Supreme Court has said in the Title VII context that the adverse action element of a retaliation claim is satisfied when the employer's conduct might "dissuade a

reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 57.  The court sees no reason why this broad interpretation of the adverse action element of a retaliation claim should not also apply to Title IX.  The definition of an adverse action would be meaningless if plaintiffs were unable to use actions taken by schools to form the bases of both retaliation and deliberate indifference claims.

## IV.  CONCLUSION

For the reasons stated above, the court will grant in part and deny in part Defendant's Motion to Dismiss.  Counts V and VII will be dismissed with leave to amend.  The motion to dismiss counts I, II, III, IV, VI, VIII and IX is denied.

A separate Order will follow.


Date:  July 11, 2019


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge